**Mary McCABE, as Administratrix of the Estate of Ruchla "Rose" Zinger, Plaintiff,**

v.

**The CITY OF LYNN, Sergeant Richard Donnelly, a Sergeant in the Lynn Police Department, Individually, Officer Gary Twyman, an officer in the Lynn Police Department, Officer William Alphen, an officer in the Lynn Police Department, Individually, Captain Csuka, a Captain in the Lynn Police Department, Individually, and in his Official Capacity, Yakov Barden, M.D., Tri–City Mental Health Hospital, John Doe, Superintendent, Tri–City Mental Health Hospital, David Rando, Edward Marticio, Life–Line Ambulance Service, Inc., and Kenneth Jackson, Defendants.**

**Civ.A. No. 92–12179–NG.**

United States District Court,
D. Massachusetts.

Feb. 2, 1995.

Anthony S. Porcello, Charles M. Campo, Jr., Kassler & Feuer, P.C., Boston, MA, for Mary McCabe, as Administratrix of the Estate of Ruchla "Rose" Zinger.

George S. Markopoulos, Lynn, MA, for City of Lynn.

Michael J. Akerson, Edward P. Reardon, Austin M. Joyce, Reardon & Reardon, Worcester, MA, George S. Markopoulos, Lynn, MA, for Richard Donnelly, Individually and as Sergeant in the Lynn Police Dept., Gary Twyman, Individually and as an officer in the Lynn Police Dept., William Alphen, Individually and as an officer of the Lynn Police Dept., Fnu Csuka, Individually and in his official capacity as Captain in the Lynn Police Dept.

Douglas A. Fecteau, Fecteau & Slingerland, Salem, MA, for Yakov Bardeu, M.D.

Linda Leffert, Gaffin & Krattenmaker, P.C., George C. Deptula, Boston, MA, for Tri–City Mental Health Hosp.

Bruce G. Von Rosenvinge, Paul F. Degnan, Edward L. Kirby, Kirby & Associates, Boston, MA, for David Rando, Edward Marticio, Life–Line Ambulance Service, Inc.

Ronald F. Spagnoli, Torto and Spagnoli, Lynn, MA, for Kenneth Jackson.

### CORRECTED MEMORANDUM AND DECISION

GERTNER, District Judge.

### I. INTRODUCTION

■ This case involves Rose Zinger who survived the Holocaust only to die at the hands of the Lynn Police. At issue is the policy of the Lynn Police to forcibly enter individuals' homes to serve involuntary commitment[1] orders, without a warrant, and solely on the authority of the officers on the scene. I find that this policy violates the Fourth Amendment's plain prohibition against the warrantless searches of homes, and seizures of persons.

After obtaining an order of involuntary commitment for Ms. Rose Zinger (a resident of Lynn), the Lynn Police served the order by breaking down her door and forcing her down a flight of stairs. Tragically, during this incident Ms. Zinger suffered a heart attack and died.

On September 4, 1992, the Administratrix of Ms. Zinger's estate (plaintiff Mary McCabe) filed a complaint seeking relief un-

---

1. I use the phrases "involuntary commitment" and "civil commitment" interchangeably to deal with proceedings under M.G.L. ch. 123 § 12.

der 42 U.S.C. § 1983 and certain common law claims against the defendants City of Lynn and various individual officers for the death of Ruchla "Rose" Zinger (hereafter "Zinger"). In addition, plaintiff sued Life-Line Ambulance Service, Inc. (hereinafter "Life-Line Ambulance"), two of its emergency medical technicians (hereinafter "EMTs") and a number of other defendants on common law negligence, assault and battery theories.[2] The motions for summary judgment concern only the civil rights claims against the City of Lynn and the negligence claims against the two EMTs of Life-Line Ambulance.[3]

For the reasons described below, the defendants' motion for summary judgment is hereby **DENIED** and the plaintiff's cross motion for summary judgment against the City of Lynn is hereby **GRANTED.**

## II. *SUMMARY OF THE FACTS*

Rose Zinger was a 64 year old woman living on 11 Nichols Avenue in Lynn, Massachusetts. Zinger spoke and understood limited English; she suffered from high blood pressure and was extremely overweight. In addition to her physical maladies, Zinger suffered from psychological problems, which according to the Complaint, were the product of, among other things, her experiences during World War II.[4]

On September 6, 1989, Dr. Yakov Barden of the Tri-City Mental Health and Retardation Center, signed an application for Zinger's involuntary commitment pursuant to M.G.L. ch. 123 § 12(a). The next day, Captain Joseph Csuka of the Lynn Police Department instructed Sergeant Richard Donnelly, and Officers Gary Twyman and William Alphen (all of the Lynn Police Department) to serve the civil commitment order. Csuka, although in possession of the order since the morning of September 7th, informed Sergeant Donnelly that the commitment would be carried out at 1:00 p.m. According to the affidavit of Sergeant Donnelly, Captain Csuka advised him that Zinger would not cooperate with them and they would have to force their way into her house.

In addition to the involuntary commitment, proceedings had been brought against Zinger

2. The complaint alleged that: (1) Lynn Police Sergeant Donnelly and Officers Twyman and Alphen deprived Ms. Zinger of her constitutional rights in violation of 42 U.S.C. § 1983 (Count I); (2) Captain John Csuka deprived Zinger of her constitutional rights in violation of 42 U.S.C. § 1983 by failing to supervise the officers under his direction (Count II); (3) the City of Lynn maintained a policy which deprived Zinger of her constitutional rights (Count III); (4) the City of Lynn breached a duty it owed to Zinger which proximately caused her death (Count IV); (5) Dr. Yakov Barden was negligent in failing to follow appropriate procedures in Zinger's involuntary commitment (Count V); (6) Tri-City Mental Health Hospital was negligent in failing to follow the appropriate procedures in Zinger's involuntary commitment (Count VI); (7) defendants David Rando, Edward Marticio and Life-Line Ambulance Services, Inc. were negligent in failing to provide adequate care to Zinger (Count VII); (8) defendants Donnelly, Twyman and Alphen assaulted and battered Zinger causing her death (Count VIII); (9) defendants Rando and Marticio assaulted and battered Zinger causing her death (Count IX); and (10) defendant Jackson breached a duty he owed Zinger by failing to intervene on behalf of Zinger when the Lynn Police Officers deprived the Zinger of her civil rights (Count X).

In a letter to the Court dated June 14, 1993, counsel for defendant Tri-City informed the Court that the claims against Tri-City and Dr. Barden had been settled. At a settlement conference held on January 3, 1995, plaintiff's counsel informed the Court that they had reached a settlement with defendant Jackson. After this Court made its preliminary ruling on the instant motions for summary judgment—that the City of Lynn's policy violated the Fourth Amendment—plaintiff's counsel informed the Court that they had reached a settlement agreement with the individual police officers named in the complaint.

3. On May 4, 1994, the City of Lynn filed a motion for summary judgment. On June 15, 1994 defendants Rando and Marticio filed motions for summary judgment. The Court heard oral argument on the summary judgment motions on September 16, 1994. The City of Lynn filed a second motion for summary judgment on December 6, 1994 addressing the constitutionality of its policy of allowing forcible entries to serve civil commitment papers. Finally, on December 14, 1994, the plaintiff filed a joint memorandum in opposition to the City of Lynn's second motion for summary judgment and a cross motion for partial summary judgment on the same issue.

4. According to the Complaint, Zinger was a survivor of the Holocaust who lost many friends and family "at the hands of Nazis."

resulting in an eviction order. Indeed, the police officers concede that the civil commitment was delayed until 1:00 p.m. in order to accommodate defendant Kenneth Jackson (a State Constable) who would secure the premises following the eviction and commitment.

At the scene, Constable Jackson informed the officers that based on his prior attempts to serve eviction notices, he believed Zinger would not answer the door. He instructed them to go to the rear door for the easiest point of entry into the home. The officers knocked on the door and rang the door-bell. Zinger did not answer. After approximately one minute, Donnelly ordered Alphen to kick down the door. Once through the door all three officers and Constable Jackson proceeded up the stairs to a second door which was also locked. Officer Alphen knocked on this door and said "Hello, Police." When no one answered the knocking, Donnelly ordered Alphen to kick this door down. After kicking through one panel, Zinger came to the door and opened it slightly. Donnelly showed Zinger the commitment order and told her that she needed to see a doctor. Zinger, who spoke and understood little English, yelled "why, why, no doctors" and started to close the door. Donnelly forced his foot between the door preventing it from closing all the way.

At this point, the officers claim that Zinger reached for a small knife on the kitchen table. Upon seeing the knife Officer Alphen pushed Zinger through the door and to the floor.[5] Zinger lay face down on the ground, confused and screaming.

With Zinger forced into a prone position, all three officers handcuffed the 64 year old woman who struggled and screamed. During the process, Zinger was so distraught she urinated on herself and one of the officers.

Shortly after arriving at the scene, the officers called defendant Life–Line Ambulance to transport Zinger to the mental health facility. While waiting for the ambulance, the officers claim that they made repeated attempts to calm Zinger down. When defendants Marticio and Rando (the Life–Line emergency medical technicians) arrived, they informed the officers that due to Zinger's obesity and disposition, they could not carry her down the stairs in a chair or stretcher. Upon hearing this, the officers forced Ms. Zinger down the stairs on her buttocks one step at a time.

After bringing her to the bottom of the stairs, the officers placed her face down on a stretcher, where she was strapped in, still handcuffed behind her back. Shortly thereafter, one of the defendants noticed blood coming down the side of Zinger's mouth.

The officers then removed the handcuffs and Marticio examined her. Finding no pulse, Marticio and one of the officers began performing CPR. Zinger was pronounced dead at 2:00 p.m.

### III. THE SUMMARY JUDGMENT STANDARD

Summary judgment should be granted where all of the relevant pleadings, viewed in the light most favorable to the non moving party, present no genuine issue of material fact such that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Alan Corp. v. International Surplus Lines Insurance Co.*, 22 F.3d 339, 342. (1st Cir.1994); *Aponte–Santiago v. Lopez–Rivera*, 957 F.2d 40, 41 (1st Cir.1992); *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990); *Griggs–Ryan v. Smith*, 904 F.2d 112, 115 (1st Cir.1990).

### IV. THE CITY OF LYNN

#### A. Liability under 42 U.S.C. § 1983

■ 42 U.S.C. § 1983 provides a private cause of action for individuals who are subject to a deprivation of their constitutional rights by persons acting under color of state law. In *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) the Court determined that municipalities and other local government units were to be included among those "persons" to whom § 1983 applies so long as

---

**5.** According to Constable Jackson's deposition, Zinger never actually reached the knife on the table, nor held the knife in her hand.

certain preconditions were met. As Justice Brennan stated:

> We conclude, therefore, that a local government may not be sued under § 1983 for an injury inflicted *solely* by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.

*Monell*, 436 U.S. at 694, 98 S.Ct. at 2037–38 (emphasis added).

■ To establish liability against a municipality under § 1983 after *Monell*, a plaintiff must prove that: (1) the municipality maintained a policy or custom; and (2) the same custom or policy was the cause of and the moving force behind the deprivation of the plaintiff's constitutional rights. *Bordanaro v. Mcleod*, 871 F.2d 1151, 1156 (1st Cir.1989) (citations omitted); *Oklahoma City v. Tuttle*, 471 U.S. 808, 819, 105 S.Ct. 2427, 2434, 85 L.Ed.2d 791 (1984).

The plaintiff contends that the City of Lynn's policy of making warrantless entries into private residences to serve civil commitment process constituted a deprivation of Rose Zinger's right to be free from unreasonable searches and seizures. It was that policy, plaintiff contends, that led to Ms. Zinger's injury and ultimately her death.

## B. *The Policy of Serving Involuntary Commitment Orders*

To support its claim that a municipal policy existed, the plaintiff points to the deposition of John W. Suslak, the City of Lynn's Rule 30(b)(6) witness who was designated the most "knowledgeable regarding the rules, regulations, and policies of the Lynn Police Department regarding the serving of involuntary commitment papers." Plaintiff's Memorandum in Opposition to the City of Lynn's Motion for Summary Judgment at p. 10. At his deposition, Suslak stated:

> I think that the officers at the scene would be obligated to take all reasonable efforts to make a peaceable entry if, in fact, under the circumstances, they were confronting, that would be safer to do. And then if they were, in fact, were advised that someone inside the apartment where we had a pink paper,[6] escalate the degree of force to effect necessary to make an entry to effect the pink paper.

*Id.* at p. 9. In other words, the City of Lynn's policy was to try to effect a peaceful execution of a civil commitment order in the first instance. But, should there be resistance, the police were authorized to "escalate the degree of force" necessary to effect the hospitalization. There was no requirement that a neutral magistrate intercede, or that a warrant be sought prior to the seizure of a human being or to the entry of a home. The officer on the line, armed only with a ten day commitment authorization, could decide when and whether to break down the door to someone's home[7] and seize them.

It is uncontested that the officers at 11 Nichols Avenue, acting pursuant to an official municipal policy, broke into Rose Zinger's apartment, and that this municipal policy could be found to have triggered the set of circumstances leading to her injury and death. The only question for summary judgment is whether the City's policy violated the Fourth Amendment.

## C. *Warrantless Searches of a Dwelling are Presumptively Unreasonable.*

The Fourth Amendment is unequivocal:

> The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

■ The Amendment's goal is the protection of personal privacy, and the fundamental

---

**6.** "Pink paper" is the colloquial name for a § 12 commitment order.

**7.** Indeed the policy apparently allowed the officers to break into a third party home if the subject of the commitment order was present.

dignity of citizens. The method of choice for protecting that goal is the warrant mechanism which requires a neutral magistrate to evaluate the facts and determine whether and when government officials may search.

The specter of police officials breaking down the door of a private home has been, from the drafting of the Fourth Amendment to the present, a singularly frightening one. Traditionally, a citizen's home has been singled out for special protection. *United States v. United States District Court*, 407 U.S. 297, 313, 92 S.Ct. 2125, 2134–35, 32 L.Ed.2d 752 (1972) ("[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed."); *Silverman v. United States*, 365 U.S. 505, 511, 81 S.Ct. 679, 682–83, 5 L.Ed.2d 734 (1961) ("at the very core" of the Fourth Amendment "stands the right of a man to retreat into his own home.")

Of equal, if not greater, significance is the seizure of the human being herself, the deprivation of her liberty. *Henry v. United States*, 361 U.S. 98, 100, 80 S.Ct. 168, 170, 4 L.Ed.2d 134 (1959) ("For it is the command of the Fourth Amendment that no warrants for *either* searches or arrests shall issue except 'upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.' ") (emphasis added.)

So important is the protection of personal privacy and the fundamental dignity of individuals against the unwarranted intrusion of governmental officials that the Supreme Court has held that all warrantless searches and seizures are presumptively unreasonable. *INS v. Delgado*, 466 U.S. 210, 215, 104 S.Ct. 1758, 1762, 80 L.Ed.2d 247 (1984); *Camara v. Municipal Court of the City & County of San Francisco*, 387 U.S. 523, 528, 87 S.Ct. 1727, 1730–31, 18 L.Ed.2d 930 (1967); *Payton v. New York*, 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980).

██ The exceptions to the warrant requirement are limited in number and strictly construed. *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Those situations include: fear of imminent destruction of evidence; the "hot" pursuit of a fleeing suspect; immediate threats to the public safety; and fires or other emergencies. *Welsh v. Wisconsin*, 466 U.S. 740, 749, 104 S.Ct. 2091, 2097, 80 L.Ed.2d 732 (1984). These "exigencies" suspend the Fourth Amendment's requirements only because pre-search compliance would be impossible if not dangerous to the surrounding community. *United States v. Irizarry*, 673 F.2d 554, 557 (1st Cir.1982) (" 'Exigent circumstances' have traditionally been found in those crisis situations when there is compelling need for official action and no time to secure a warrant.") (*citing Michigan v. Tyler*, 436 U.S. 499, 509, 98 S.Ct. 1942, 1949, 56 L.Ed.2d 486 (1978)) (warrantless entry into a burning building to put out a blaze). *See also Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685, *reh'g. denied*, 396 U.S. 869, 90 S.Ct. 36, 24 L.Ed.2d 124 (1969) (search "incident to arrest"); *Warden v. Hayden*, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967) (warrantless entry in "hot" pursuit of an armed robber); *Ker v. California*, 374 U.S. 23, 40–43, 83 S.Ct. 1623, 1633–35, 10 L.Ed.2d 726 (1963) (warrantless entry to prevent destruction of evidence where such destruction is reasonably thought imminent); *United States v. Zurosky*, 614 F.2d 779 (1st Cir.1979) (warrantless entry into warehouse at 4:25 a.m. when activity inside reasonably suggests that a breaking and entering is taking place); *United States v. Edwards*, 602 F.2d 458, 468 (1st Cir.1979) (warrantless entry to prevent destruction of heroin reasonably thought imminent; *United States v. Miller*, 589 F.2d 1117, 1126 (1st Cir.1978), *cert. denied*, 440 U.S. 958, 99 S.Ct. 1499, 59 L.Ed.2d 771 (1979) (warrantless entry and reentry of a boat where drowning suspected and tidal flow created need for swift action).

To be sure, in certain non-criminal, regulatory or administrative situations, the Court has held that the Fourth Amendment did not apply at all, or that the high level of protection offered by a warrant was unnecessary so long as the search was otherwise "reasonable." For the most part, these involve instances where the Court has characterized the intrusion as far less invasive than tradi-

tional searches and seizures.[8] In *Wyman v. James*, 400 U.S. 309, 326, 91 S.Ct. 381, 390, 27 L.Ed.2d 408 (1971), for example, the Supreme Court upheld a New York statute which made receipt of welfare benefits contingent upon the beneficiary's assent to a home visit by a state social worker. In upholding the statute, the *Wyman* Court stated that "the home visitation as structured by the New York statutes is a reasonable administrative tool; that it serves a valid and proper administrative purpose for the dispensation of the AFDC program; that it is not an unwarranted invasion of personal privacy; and that it violates no right guaranteed by the Fourth Amendment." *Wyman*, 400 U.S. at 326, 91 S.Ct. at 390. The Court rested its decision on a determination that the purpose of the home visit requirement was "both rehabilitative and investigative," and thus, not the functional equivalent of a search in the traditional criminal law context. *Wyman*, 400 U.S. at 317, 91 S.Ct. at 385.

Although warrantless social worker "visitations" may be minimally invasive and fail to trigger the warrant protections of the Fourth Amendment, the warrantless entry into a private dwelling for the sole purpose of seizing and forcibly hospitalizing the resident is surely another matter.[9]

■ When liberty is involved, as well as the privacy of one's home, the highest protec-

tion of the Fourth Amendment, namely the warrant mechanism is required. When referring to the warrantless entry of a home to execute an arrest warrant, the Court in *Payton v. New York*, 445 U.S. 573, 588, 100 S.Ct. 1371, 1381, 63 L.Ed.2d 639 (1980), cited to the following language, with approval:

> To be arrested in the home involves not only the invasion attendant to all arrests but also an invasion of the sanctity of the home. This is simply too substantial an invasion to allow without a warrant, at least in the absence of exigent circumstances, even when it is accomplished under statutory authority and when probable cause is clearly present.

*citing United States v. Reed*, 572 F.2d 412, 423 (1978), *cert. denied sub. nom. Goldsmith v. United States*, 439 U.S. 913, 99 S.Ct. 283, 58 L.Ed.2d 259.

**D. The Requirements of the Fourth Amendment Apply to Entries Under M.G.L. ch. 123 § 12**

■ The function of M.G.L. ch. 123 § 12 is to provide the Commonwealth with the ability to place an individual in the custody of a hospital facility in order to prevent serious harm as a result of the individual's mental illness. It provides a method for exercising control over the individual, to deprive him or her of liberty and necessarily, privacy, even

---

8. For example, *Griffin v. Wisconsin*, 483 U.S. 868, 873, 107 S.Ct. 3164, 3168, 97 L.Ed.2d 709 (1987) (finding warrantless search of a parolee's home by probation officials reasonable); *O'Connor v. Ortega*, 480 U.S. 709, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987) (allowing warrantless, work-related searches of employee's desks and offices without probable cause); *New Jersey v. T.L.O.*, 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985) (school officials may conduct warrantless searches of some student property without probable cause); *New York v. Burger*, 482 U.S. 691, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987) (permitting warrantless search of automobile junkyards as business "closely regulated" by the state); *United States v. Cardona*, 903 F.2d 60, 69 (1st Cir.1990) (finding warrantless arrest of parole violator in his home valid as a "special needs" exception to the warrant requirement).

9. In *Soldal v. Cook County, Illinois*, — U.S. —, 113 S.Ct. 538, 121 L.Ed.2d 450 (1992) for instance, the Court determined that police officers that conspire with private individuals to

execute an illegal self help eviction are liable for violations of the Fourth Amendment. The seizure and removal of the plaintiff's home fit within the Amendment's protections no matter how the action was labelled. The Court noted:

> In our view, the reason why an officer might enter a house or effectuate a seizure is wholly irrelevant to the threshold question of whether the [Fourth] Amendment applies. What matters is the intrusion on the people's security from governmental interference. Therefore, the right against unreasonable seizures would be no less transgressed if the seizure of the house was undertaken to collect evidence, verify compliance with a housing regulation, effect an eviction by the police, or on a whim, for no reason at all. As we have observed on more than one occasion, it would be "anomalous to say that the individual and his private property are fully protected by the Fourth Amendment only when the individual is suspected of criminal behavior."

*Soldal*, — U.S. at —, 113 S.Ct. at 548 (quoting *Camara*, 387 U.S. at 530, 87 S.Ct. at 1731).

if only on a temporary basis. While the label may be beneficent—for the patient's own good or the good of the society—the fact remains that it is a seizure of the person, effected in this case by a forcible entry into a citizen's home.

The City of Lynn argues that an application for an order of involuntary commitment—completed by a *physician*—by statute obviates the need for a warrant. While the statute provides for a warrant proceeding, Lynn claims that it only applies when an individual *other* than a physician or a police officer seeks a ten-day commitment. M.G.L. ch. 123 § 12(a) permits a licensed physician or psychologist to "restrain or authorize the restraint of [a] person and apply for hospitalization of such person for a ten day period" based on a finding of "a likelihood of serious harm by reason of mental illness," apparently on that physician's own authority. In fact, the statute does not require the doctor to personally examine the patient, but may make the diagnosis based upon "facts or circumstances" represented to him. Section 12(e) permits "any person" to apply for a ten-day commitment but specifies that the application must be made to "a district court justice." The District Court must hold a hearing and, if it determines that the evidence is sufficient, it "may issue a warrant for the apprehension and appearance before him of the alleged mentally ill person, if in his judgment the condition or conduct of such person makes such action necessary or proper."

It might be suggested that this is a valid procedure because civil commitment processes are medical, or therapeutic, and as a result, less invasive than a traditional criminal search (as in *Wyman v. James, supra* ). Indeed, one might argue that the fact that a physician is apparently in charge, and that this is "only" a ten-day institutionalization subject to a court review makes it a "reasonable" civil entry, without requiring the formal protection of a warrant. *See* e.g. Note, *Rehabilitation, Investigation, and the Welfare Home Visit*, 79 Yale L.J. 746 (March 1971).

■ I disagree. Although a certified physician or psychologist might be uniquely qualified to evaluate the emotional condition of a patient, he or she is not qualified to determine whether probable cause exists to support an unconsented entry of an individual's home or seizure of an individual. The Constitution specifically imparts that responsibility to the judiciary. *Thompson v. Louisiana*, 469 U.S. 17, 19–20, 105 S.Ct. 409, 410–11, 83 L.Ed.2d 246 (1984) (per curiam) (*quoting Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967) (footnotes omitted)); *Mincey v. Arizona*, 437 U.S. 385, 390, 98 S.Ct. 2408, 2412, 57 L.Ed.2d 290 (1978); *see also United States v. Place*, 462 U.S. 696, 701, 103 S.Ct. 2637, 2641, 77 L.Ed.2d 110 (1983).

■ Moreover, the agents of the doctors in this case are police officers with guns and batons, not hospital orderlies and nurses. There is no therapeutic relationship which a warrant mechanism might disrupt. That disruption has already occurred once the police—unaccompanied by physicians or health personnel—seek a forcible entry and seizure. In fact, the parties constantly referred to the service of the commitment order as a "police matter." In any case, to the person whose home is broken into, to the neighbors who watch her dragged from her home screaming and struggling, the words "medical" or "therapeutic" would seem to be a misnomer.[10]

■ In effect, Lynn suggests that a physician's blessing somehow strips a putative mental patient of the safeguards of the Fourth Amendment, a result that would be untenable. As the experience of the former Soviet Union suggests, coerced hospitalization, ostensibly because of mental illness, is uniquely susceptible to abuse. Indeed, Massachusetts was one of the innovators in identifying the risks to individual liberty and dignity in the civil commitment process. The legislature achieved this by hedging the statute with strict safeguards—that the order of commitment be temporary unless certain

---

**10.** In fact, substantial privacy issues would arise if a civil commitment order were served when the subject was at the home of another, who does not consent to entry. *See Steagald v. United*

*States*, 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981) (requiring a search warrant for a third person's home to effect an arrest of a suspect located therein).

standards are met, that the order be subject to periodic judicial review—and that a warrant be required under certain circumstances. I believe that this case is one of them.[11]

### E. *There Were no Exigent Circumstances Justifying Dispensing with the Warrant Requirement*

 There were no exigent circumstances in this case, justifying the suspension of the warrant requirement. The test for determining the presence of exigent circumstances which would suspend the warrant requirement "is whether there is such a compelling necessity for immediate action as will not brook the delay of obtaining a warrant." *United States v. Adams,* 621 F.2d 41, 44 (1st Cir.1980). The burden of proving the necessity for a warrantless search is on the Government, and that burden is a substantial one. *Welsh v. Wisconsin,* 466 U.S. 740, 750, 104 S.Ct. 2091, 2097–98, 80 L.Ed.2d 732 (1983).

 The determination of exigent circumstances rests on "the gravity of the underlying offense; whether delay poses a threat to police or the public safety; whether there is a great likelihood that evidence will be destroyed if there is delay until a warrant can be obtained." *United States v. Curzi,* 867 F.2d 36, 41–42 (1st Cir.1989) (*quoting United States v. Veillette,* 778 F.2d 899, 902 (1st Cir.1985)). *See also United States v. Wilson,* 36 F.3d 205, 209–210 (1st Cir.1994) (finding exigent circumstances to enter an apartment in housing development and seize contraband).

The only exigent circumstances that the City points to are those underlying the civil commitment order itself: (1) that the statute requires that an order may only be issued "so as to avoid the likelihood of serious harm by reason of mental illness"; and (2) that Dr. Barden's application specifically notes that Ms. Zinger is dangerous to others.

According to the depositions submitted, the application for an involuntary order of commitment for Ms. Zinger was completed by Dr. Barden on September 6, 1989. Constable Jackson arranged for the application to be taken from Dr. Barden's office to the Lynn Police station on the next day. Jackson discussed the situation with Captain Csuka, informing the officer that he would be conducting the eviction proceeding at 1:00 p.m. Csuka agreed to that hour and informed Jackson that he would have Lynn Police Officers meet Jackson at 11 Nichols Avenue to serve the commitment order. At 10:30 a.m., Csuka, true to his word, ordered Sergeant Donnelly to meet Jackson at the premises at 1:00 p.m. to serve the order. Csuka further informed Donnelly that the officers serving the order might have to force their way into Zinger's home.

 The presence of Dr. Barden's application for the order of involuntary commitment did not amount to exigent circumstances justifying the forced warrantless entry into Zinger's home. To the contrary, the Lynn Police acted with *leisure* in arranging a convenient time to effectuate the service of the involuntary commitment order. The determinative issue was convenience, dovetailing the service of the commitment order with the service of the eviction papers. As Justice Jackson stated in *McDonald v. United States:*

> When an officer undertakes to act as his own magistrate, he ought to be in a position to justify it by pointing to some real immediate and serious consequences if he postponed action to get a warrant.

335 U.S. 451, 459–460, 69 S.Ct. 191, 195, 93 L.Ed. 153 (1948). No such consequences were present here.

Based upon Constable Jackson's prior attempts to serve the eviction process the officers had no indication that waiting a few hours would present an immediate threat to either Ms. Zinger or the community. Moreover, since the officers already had information that Ms. Zinger would not let them into her home, they could have presented that

---

**11.** The statute does not mandate a different interpretation. Indeed, a saving constitutional interpretation is entirely consistent with the statutory framework. A warrant would be required when-

ever it is clear that the "pink paper" will not be voluntarily complied with, that police officers will be involved, and force is threatened.

information and the involuntary commitment order to a magistrate *prior* to their attempt to serve the order at 1:00 p.m. Instead, the officers (following City policy) chose to break into Zinger's home to serve the civil commitment order. Therefore, no emergency situation existed which would justify the officers' entry into Zinger's home without a warrant. *See, Suss v. A.S.P.C.A.*, 823 F.Supp. 181, 187–188 (S.D.NY 1993) (finding no exigent circumstances to justify ASPCA breaking into a business to rescue a cat trapped in adjoining alley). Accordingly, the plaintiff's cross motion for summary judgment against the City of Lynn is **GRANTED.**

## V. *DEFENDANTS MARTICIO AND RANDO*

Defendants Marticio and Rando argue that M.G.L. ch. 111C § 14 grants emergency medical technicians immunity from liability and therefore they are entitled to judgment as a matter of law. M.G.L. ch. 111C § 14 states in relevant part:

> No emergency medical technician certified under the provisions of this Chapter[12] and no police officer or fire fighter, who in the performance of his duties and in *good faith* renders emergency first aid or transportation to an injured person or to a person incapacitated by illness shall be personally in any way liable as a result of rendering such aid or as a result of transporting such person to a hospital or other safe place.

(emphasis added). The issue here is whether Rando and Marticio acted in good faith when they "treated" Zinger.

■ The defendants are entitled to a presumption in favor of good faith. *Spiegel v. Beacon Participations, Inc.*, 297 Mass. 398, 416–417, 8 N.E.2d 895 (1937); *Ramos v. Board of Selectmen of Nantucket*, 16 Mass. App.Ct. 308, 314, 450 N.E.2d 1125 (1983). In *Ramos*, the court described bad faith as:

> [A] general and somewhat indefinite term. It has no constricted meaning. It cannot be defined with exactness. It is not simply bad judgment. It is not merely negligence. It imports a dishonest purpose or some moral obliquity. It implies conscious doing of wrong. It means a breach of a known duty through some motive of interest or ill will. It partakes of the nature of fraud.

*Ramos*, 16 Mass.App.Ct. at 314, 450 N.E.2d 1125.

■ Here, the plaintiff offered testimony that Ms. Zinger was left unattended, lying face down on a stretcher handcuffed behind her back, that the EMTs never interceded concerning the way in which she was being restrained by the police and never monitored her medical condition. Under these circumstances, the plaintiff satisfied its burden and overcame the presumption of good faith sufficient to create a material issue of fact as to whether defendants Rando and Marticio acted in good faith and are therefore entitled to the protection of M.G.L. ch. 111C § 14.[13] Accordingly, defendants Rando and Marticio's motion for summary judgment is hereby **DENIED.**

## VI. *CONCLUSION*

For the foregoing reasons, the defendants' motion for summary judgment is hereby **DENIED** and the plaintiff's cross motion for summary judgment against the City of Lynn is hereby **GRANTED.**

**SO ORDERED.**

---

12. Both Rando and Marticio were certified emergency medical technicians at the time of the incident.

13. In other jurisdictions which have a "good samaritan" statute similar to M.G.L. ch. 111C § 14, the issue of whether the EMTs acted in good faith was a matter of fact reserved for the jury. *Wright v. City of Los Angeles*, 219 Cal. App.3d 318, 346–347, 268 Cal.Rptr. 309 (2d. Dist., 1990) (affirming jury's award of damages against paramedics for gross negligence).