**UNITED STATES of America**

v.

**Mark RODRIGUEZ and Eddie Torres.**

Cr No. 95–30019–MAP.
Nos. 80, 83, 85 & 88.

United States District Court,
D. Massachusetts.

June 18, 1996.

Bernard T. O'Connor, Jr., O'Connor, Martinelli & Cohn, Springfield, MA, for Mark Rodriguez.

Matthew J. King, Robinson, Donovan, Madden & Barry, Springfield, MA, for Eddie Torres.

Andrew Levchuk, United States Attorney's Office, Springfield, MA, for U.S.

*MEMORANDUM AND ORDER RE-GARDING RODRIGUEZ MOTION TO SUPPRESS, TORRES MOTION TO SUPPRESS, TORRES MOTION TO DISMISS AND TORRES MOTION TO SUPPRESS STATEMENTS*

(Docket Nos. 80, 83, 85 & 88)

PONSOR, District Judge.

On January 16, 1996, Magistrate Judge Neiman issued a lengthy and thoughtful Report and Recommendation regarding a number of motions to suppress and to dismiss filed by the defendants in this case. Although some of the decisions are close, this court finds that the magistrate judge sensitively balanced the various considerations and that his recommendations offer the best resolution of all the issues raised. His Report and Recommendation will therefore be adopted in its entirety.

One aspect of the Report and Recommendation deserves special comment.

With regard to Docket No. 88, the motion of the defendant Torres to suppress his statement of February 21, 1995, the magistrate judge recommended allowance on the ground that the defendant had not been given his *Miranda* warnings effectively and that the "public safety" exception to the *Miranda* rule did not apply on these facts.

The seminal case establishing the existence of the public safety exception *is New York v. Quarles*, 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984). In that case, the police "in the very act of apprehending a suspect, were confronted with the immediate necessity of ascertaining the whereabouts of a gun which they had every reason to believe the suspect had just removed from his empty holster and discarded in the supermarket." *Id.* at 657, 104 S.Ct. at 2632. As the Fourth Circuit recently observed, the public safety rule is an exception and "must be construed narrowly." *U.S. v. Mobley*, 40 F.3d 688, 693

(4th Cir.1994). It only applies where there is a "objectively reasonable need to protect the police or the public from [an] immediate danger associated with [a] weapon."

To recognize the application of the public safety rule in the circumstances of this case would permit the exception virtually to swallow the rule. At the time the Torres statement was given on February 21, 1995, three suspects were in custody and the apartment was thoroughly secured. The defendant himself had been removed from the apartment and some fifteen minutes had passed since his arrest. A preliminary sweep of the apartment had taken place and certain incriminating evidence had already been found. While it is true, as the Government argues, that the timing of the administration (or attempted administration) of *Miranda* warnings is generally not dispositive, it was a factor to be taken into consideration. Similarly, while the cases do not set any particular time limit for application for the public safety exception, the passage of time here was substantial and significant.

Guns are always dangerous, and it is always a matter of urgency to locate them, particularly in a crowded urban setting. But to recognize the application of the public safety exception in these circumstances would be to virtually establish a per se rule with regard to firearms as an exception to the *Miranda* rule. No court has as yet done this, and *Quarles* strongly suggests that the exception applies only in the immediate context of an arrest.

For these reasons, the court will adopt the Report and Recommendation of the magistrate judge and allow the motion to suppress of the defendant Torres with regard to his statement of February 21, 1995.

In sum, the motion of the defendant Rodriguez to suppress (Docket No. 80) is DENIED with respect to all physical evidence seized during the searches, DENIED with respect to his statements of February 21, 1995 and ALLOWED with respect to his statements of May 26, 1995. The motion of the defendant Torres to suppress physical evidence seized during the search (Docket No. 83) is DENIED. His Motion to Dismiss

(Docket No. 89) is DENIED. As noted, his motion to suppress (Docket No. 88) is ALLOWED.

It is So Ordered.

*REPORT AND RECOMMENDATION WITH REGARD TO DEFENDANT MARK RODRIGUEZ'S MOTION TO SUPPRESS PHYSICAL EVIDENCE AND STATEMENTS (Docket No. 80), DEFENDANT EDDIE TORRES' MOTION TO SUPPRESS (Docket No. 83), DEFENDANT EDDIE TORRES' MOTION TO DISMISS (Docket No. 85) and DEFENDANT EDDIE TORRES' MOTION TO SUPPRESS STATEMENTS MADE TO THE POLICE (Docket No. 88)*

NEIMAN, United States Magistrate Judge.

An evidentiary hearing was held on November 16, 1995 and November 21, 1995 with respect to the above-captioned motions. Defendant Mark Rodriguez ("Rodriguez") seeks to suppress the physical evidence seized during and as a result of the searches of the apartment where he lives, together with statements made by him on February 21, 1995 and May 26, 1995 (Docket No. 80). Similarly, Defendant Eddie Torres ("Torres") seeks to suppress evidence seized during the searches on February 21 and 22, 1995 of Rodriguez's home (Docket No. 83), as well as statements made to police on or about February 21, 1995 (Docket No. 88). In addition, Torres seeks to dismiss the indictment (Docket No. 89). Defendants' motions have been referred to the Court for a report and recommendation pursuant to Rule 3 of the rules for United States Magistrates for the United States District Court for the District of Massachusetts. 28 U.S.C. § 636(b)(1)(B).

## I. FACTS

Rodriguez and Torres are both charged with knowingly possessing firearms not registered to them in the National Firearms Registration and Transfer Record in violation of 26 U.S.C. § 5861(d), namely, two shotguns having barrels of less than 18 inches in length, a Savage Model 67 12 gauge shotgun, serial number C155283, and a Mossberg Model 500A 12 gauge shotgun, serial number J367911. In addition, Torres is charged with being a felon in possession of a firearm, namely, a Norinco Model SKS7.62X39 semi-automatic rifle, serial number 22041978, having previously been convicted of a crime punishable by imprisonment for a term exceeding one year, in violation of 18 U.S.C. § 922(g)(1). The charges arose out of events which began on the evening of February 21, 1995.

At approximately 10:00 p.m., two individuals were shot and seriously wounded in a drive-by shooting on Longhill Street in Springfield, Massachusetts. First Transcript from November 16, 1995 Hearing (Docket No. 100) (hereinafter "T1") at 9–10, 30–31. Witnesses described the vehicle from which the shots were fired as a large brown or maroon car. T1 at 31–33. This information was disseminated to law enforcement officials in surrounding communities. Second Transcript from November 16, 1995 Hearing (Docket No. 102) (hereinafter "T2") at 5. At approximately 10:45 p.m., Holyoke Police Officer Lonnie Westbrook ("Westbrook"), working a security job at the Jarvis Heights apartments in Holyoke, observed a vehicle matching the above description, with a blown-out rear window, pull into a parking area and drop off three individuals. These individuals appeared to be carrying something long into a building at 360 Jarvis Ave. T1 at 11, 13, 40. Westbrook was said to have described the objects as "probably two long guns." T1 at 39. Westbrook followed the vehicle to a school next to the apartment complex and observed the driver abandon the vehicle and leave on foot towards the apartments. T1 at 11; T2 at 6.

Members of the Western Massachusetts Gang Task Force responded to the area and examined the vehicle, which had its engine still running. T1 at 10–11. The vehicle was a stolen Chevrolet Monte Carlo with broken pieces of glass still in its rear window frame. T1 at 11–12. Located in the vehicle was a spent 12 gauge shotgun shell as well as a spent brass casing from a rifle shell. Id. The vehicle was secured for further investigation.

A number of police officers surrounded the apartment building at 360 Jarvis Avenue and positioned themselves at various vantage points. T1 at 139–149, 84–85; T2 at 6, 19–20. The total number of officers, including state and local police, amounted to between ten and fifteen over the course of the events that ensued. T1 at 53, 85–86; T2 at 19. In addition, there were a number of both marked and unmarked police cars in the area. T1 at 86–87; T2 at 19. Police officers went from apartment to apartment at 360 Jarvis Avenue looking for the three individuals. T1 at 14, 45. At some point, one officer knocked on the door of Apartment I and was greeted by a woman later identified as Cruz Maria Rodriguez ("Mrs. Rodriguez"), Defendant Mark Rodriguez's mother. An officer present at that time indicated that he knew Mrs. Rodriguez and that she was "okay." The officers left. Subsequently, another tenant advised other officers that her buzzer had been rung, that she observed three individuals, at least two of whom were carrying guns, run by her in a hurry and that she heard commotion in the apartment directly above her. T1 at 15, 46–47, 85–86, 90–91. That apartment was Apartment I. The events surrounding the officers' approach to Apartment I and their warrantless search of that apartment are in dispute.[1]

### A. Trooper Spellacy

Trooper John Spellacy ("Spellacy") of the Massachusetts State Police testified that he approached the door to Apartment I together with Officer Vasquez and Sergeant Higgins of the Holyoke Police Department. T1 at 16, 48, 88. His gun was not drawn, T1 at 48, 94, 97, although it may have been visible, T1 at 97–98. He was unaware if the other officers' guns were drawn. T1 at 103. After he knocked, the door was opened by an individual later identified as Rafael Rodriguez ("Mr. Rodriguez"), Defendant Mark Rodriguez's father. T1 at 16, 88. Spellacy had no recollection of smelling an odor of alcohol on Mr. Rodriguez. T1 at 49–50; 89–90. Spellacy identified himself as a state police officer, stated that he was investigating a shooting in Springfield and had reason to believe that there were three individuals in the apartment who were armed. T1 at 17, 90. Mr. Rodriguez asked if he had a "paper," to which Spellacy responded by asking if he meant a search warrant. T1 at 17, 98. After Mr. Rodriguez said "yes," Spellacy replied "no," but that he could get one. T1 at 17, 99. Spellacy again indicated that he had reason to believe that there were three individuals in the apartment who were armed and he did not want anyone to get hurt. T1 at 17, 99. Spellacy testified that Mr. Rodriguez paused, looked at Spellacy, appeared to be thinking it over, shrugged his shoulders, said "okay" and then stepped aside. T1 at 17, 111–112, 121–123.

As Spellacy and two other officers entered the apartment, Spellacy noticed that a woman, later identified as Mrs. Rodriguez, was seated on a couch. T1 at 17, 54. Spellacy looked in one bedroom and then proceeded down the hall to a second bedroom, the door of which was ajar. T1 at 18, 56–57. As he walked down the hall, Spellacy drew his gun. T1 at 57, 60. The other officers followed behind Spellacy, who did not recall whether or not their guns were drawn. In the second bedroom, Spellacy observed an individual, later identified as Defendant Mark Rodriguez, on the bed and apparently sleeping. T1 at 18, 57, 60. Spellacy woke Rodriguez and recognized him at the time, although he did not know that he lived in that apartment. T1 at 19. When Rodriguez opened his eyes, he inquired about what was going on. T1 at 60.

Spellacy told Rodriguez to get off the bed and Officer Higgins took him into custody. T1 at 19, 62–65. Spellacy did not ask for any identification at that time given that his primary concern was about weapons and personal safety. T1 63–64. (Spellacy later observed personal belongings and a wallet in the bedroom belonging to Rodriguez. T1 at 28–29, 63.) Spellacy then saw an individual, later identified as Defendant Eddie Torres, behind a dresser in the same bedroom. T1 at 19, 65, 68. Spellacy pulled Torres from behind the dresser and noticed that there

---

1. The following facts with respect to the search are set forth from three different points of view. The facts with respect to Torres' and Rodriguez's respective motions to suppress statements they each made are set forth in the applicable sections of the discussion.

was yet another individual secreted behind the dresser. T1 at 19–20, 67. Officer Vasquez scuffled with this other individual as he pulled him around the side of the dresser. T1 at 20, 67–68.

Spellacy testified that, concerned about safety, he called out "Where are the guns?" T1 at 69–70, 76–78. The question was addressed generally, but was not answered by any of the three individuals found in the bedroom. T1 at 70. Spellacy had not yet given any *Miranda* warnings at the time he blurted out the question. T1 at 72. All three individuals were then secured and found not to have weapons on their person. T1 at 71. Spellacy testified that he "believed" that he gave Torres a *Miranda* warning in the English language. T1 at 72–73. He also recalls Officer Vasquez giving a *Miranda* warning to Torres in Spanish. Torres, who gave no statements in the bedroom, was handcuffed and moved out of the building to a parking lot and then to Spellacy's cruiser. T1 at 73, 74–75. Spellacy then asked Torres if there were any guns in the apartment. T1 at 75. Torres started to cry and stated that the guns were in the bedroom. T1 at 81.

In the meantime, officers in the apartment noticed a detached barrel of a double-barrel shotgun in the bedroom where the individuals were arrested and observed a rifle on the outside porch. Mr. Rodriguez thereafter withdrew his consent to search the apartment, T1 at 22, 128, and the apartment was secured in anticipation of obtaining a search warrant. T1 at 22–24.

On February 22, 1995, at approximately 4:45 a.m., a state search warrant was in fact executed at 360 Jarvis Avenue, Apartment I. T1 at 25–26. The search revealed the following: a Savage Model 67, 12 gauge shotgun, serial number C155283, with a barrel length of approximately 17 inches; a Mossberg Model 500A, 12 gauge shotgun, serial number J367911, with a barrel length of approximately 15¾ inches; and a Norinco Model SKS7.62X39, semi-automatic rifle, serial number 22041978. All three firearms were found under a dresser in Rodriguez's bedroom. T1 at 26–27.

### B. Cruz Maria Rodriguez

Mrs. Rodriguez, also testified with respect to the evening in question. According to her testimony, she went to Bingo early that evening and returned later, around 10:00 or 10:30 p.m., to find her husband, Mr. Rodriguez, passed out on the couch. T2 at 30–31. Suspecting her husband had been drinking, Mrs. Rodriguez checked the wastebasket and found a whiskey bottle and beer bottles. T2 at 31–32, 48. She then took a shower and returned to the living room. T2 at 31. Mrs. Rodriguez then noticed a fair amount of noise and commotion outside, saw police searching the fields outside with flashlights and heard people running up and down the hallways. T2 at 33–35, 50–51. At some point, there was a knock at the door and she told a police officer that no one was in the apartment. T2 at 60–61. One of the officers, who evidently is married to a cousin of Mrs. Rodriguez, indicated that he knew her and that "they're okay." T2 at 72, 61.

About fifteen minutes after the first knock, Mrs. Rodriguez heard a loud bang on the door. Mr. Rodriguez woke up saying something to the effect of "Who in the hell is that?" T2 at 35–36, 57. He walked in a wobbly fashion over to the door and was "tongue-tied" because he had been drinking. T2 at 36. Upon opening the door, the officer, later identified as Trooper Spellacy, indicated that he and the others with him were looking for three men and that they needed to search the apartment. She did not hear Spellacy identify himself as a police officer. T2 at 40–41, 59. Behind Spellacy were three or four men. T2 at 40, 58. Specifically, Mrs. Rodriguez testified that Spellacy said that "we're looking for three men and he says we've got to search your apartment because they were seen running into the building." T2 at 38. She also testified that, according to Spellacy, "they needed to check my apartment." T2 at 39.

Mrs. Rodriguez testified that Spellacy's gun was drawn and that he was holding it down. T2 at 38–39, 41, 59. She indicated that all of the other officers had their guns drawn as well and that she was scared. T2 at 41–42, 63. She herself did not consent to the officers entering the apartment and she

remained on the couch. She never heard the officers tell her husband that he had a right to refuse their entry, although Spellacy "asked if he could come in." T2 at 41. See also T2 at 59. She did not hear her husband tell the officers it was okay to search the apartment. T2 at 42. All she saw was her husband shrugging his shoulders, as if the officers would have come in anyway even if he had not let them enter. T2 at 43. She noticed her husband shrug his shoulders and step back. T2 at 59–60. The police then pushed her husband out of the way as they came in. T2 at 60. The police presence did not make her concerned about the whereabouts of her son. T2 at 51.

### C. Rafael Rodriguez

Mr. Rodriguez also testified. He is sixty-seven years of age with a second grade education. Transcript From November 21, 1995 Hearing (Docket No. 96) (hereinafter "T3") at 5. He testified that his son had been living at the apartment at the time in question. T3 at 5–6. Mr. Rodriguez had been drinking scotch and beer in the early evening until about 6:30 p.m., by which time he had had seven or eight drinks of each. T3 at 6–7. Mr. Rodriguez then had one or two more drinks and fell asleep on the couch in front of the television. He awoke when the police knocked at the door. T3 at 8.

Mr. Rodriguez testified that, when he opened the door, he saw four to six police officers. T3 at 9, 16. One officer, later identified as Trooper Spellacy, was not wearing a uniform, and did not display a badge. T3 at 9–10. Spellacy indicated that the officers were looking for three men. Mr. Rodriguez recalled that all of the officers had their guns drawn. T3 at 10–11, 28. Spellacy asked if they could look around the apartment and Mr. Rodriguez said "Yeah". T3 at 12. Mr. Rodriguez claimed that the police were already in the door, T3 at 11–12, that he was drunk, T3 at 13, that he just shrugged his shoulders, T3 at 14, 21, and that, although he stepped back, T3 31, he never said it was okay to enter the apartment, T3 at 13–14, 31. Mr. Rodriguez also stated that Spellacy did not mention anything about getting permission to search or

of his right to refuse entry; nor was Mr. Rodriguez asked to sign anything. T3 at 14–15. Mr. Rodriguez further testified that four officers entered the apartment with their guns drawn, that he was frightened and that he had never seen so many guns in his life. T3 at 15–16. Later that night he himself was arrested and handcuffed and, according to Mr. Rodriguez, a gun had been pointed at his head when he refused to get down on his knees. T3 at 17–19, 32–33. He further testified, as did Mrs. Rodriguez, that he did not recognize any of the guns shown in photographs to him on cross-examination. T3 at 20–23.

## II. MOTIONS TO SUPPRESS PHYSICAL EVIDENCE SEIZED DURING SEARCHES

### A. Standing

■ Both Torres and Rodriguez have moved, pursuant to Fed.R.Crim.P. 12(b) and the Fourth Amendment to the United States Constitution, to suppress any and all physical evidence seized by law enforcement officials during the two searches at 360 I Jarvis Avenue on February 21st and 22nd. Defendants assert that the first search, a warrantless search by Spellacy and others, violated Defendants' rights because no voluntary consent to search was given. See generally *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Defendants also assert that the second search, pursuant to a warrant, was conducted in violation of their rights because the application process was influenced or effected by information obtained following the illegal warrantless entry into the Rodriguez's home.

■ There is no question that Mr. Rodriguez, having authority over the apartment, could give consent for the warrantless search. See *United States v. Matlock*, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). There is also no question that Defendant Rodriguez, having occupied the premises, had a reasonable expectation of privacy therein and, therefore, standing to challenge the search. See *Rakas v. Illinois*, 439 U.S. 128, 143, 99 S.Ct. 421, 430, 58 L.Ed.2d 387 (1978). The demonstration of a legitimate expectation of privacy "is a threshold stand-

ing requirement, and analysis cannot proceed further without its establishment." *United States v. Cruz Jimenez*, 894 F.2d 1, 5 (1st Cir.1990).

Defendant Torres, however, makes no such claim, not even as an overnight guest. See *Minnesota v. Olson*, 495 U.S. 91, 96–97, 110 S.Ct. 1684, 1688, 109 L.Ed.2d 85 (1990) (overnight guest has a legitimate expectation of privacy in his host's home). Because Torres had no expectation of privacy, he cannot assert any Fourth Amendment rights with respect to the warrantless search of the Rodriguez apartment, even if that search was unreasonable as to Defendant Rodriguez. See *United States v. Levasseur*, 699 F.Supp. 995 (D.Mass.1988), *aff'd sub nom United States v. Curzi*, 867 F.2d 36 (1st Cir.1989).

Nor is it inconsistent, despite Torres' argument to the contrary, to find that Torres had no "proprietary" interest in the premises searched, and therefore no standing to challenge the search, but that Torres had a potential "possessory" interest in the premises searched in order to link him to the weapons discovered. These are two separate questions. The Supreme Court, in fact, has recognized that a defendant in legal possession of an item does not necessarily have a legitimate expectation of privacy in the place from which the item is seized. *United States v. Salvucci*, 448 U.S. 83, 91, 100 S.Ct. 2547, 2552–53, 65 L.Ed.2d 619 (1980). The Government's burden to prove the elements of firearms possession by Torres is an independent matter. See *United States v. Wight*, 968 F.2d 1393 (1st Cir.1992); and *United States v. Rogers*, 41 F.3d 25 (1st Cir.1994), *cert. denied*, — U.S. —, 115 S.Ct. 2287, 132 L.Ed.2d 289 (1995). That the Government must, in applicable part, show that Torres exercised dominion and control over the area in which the firearm was located does not create in Torres' an expectation of privacy in the apartment.

Lacking standing, Torres' motion to suppress evidence seized during the searches of February 21 and 22, 1995 should be denied. The following discussion, therefore, concerns only Rodriguez's motion to suppress the physical evidence seized as a result of the searches.

## B. Discussion

According to the Fourth Amendment, every person has a right "to be secure in their ... houses ... against unreasonable searches and seizures." When privacy of one's home is involved, the highest protection of the Fourth Amendment, namely the warrant mechanism, is required. *McCabe v. City of Lynn*, 875 F.Supp. 53, 60 (D.Mass. 1995). Searches conducted without a warrant are presumptively unreasonable. *Cruz Jimenez*, 894 F.2d at 6 (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971)). Where, as here, the Government has obtained evidence as a result of a warrantless search, and has used that evidence to form the basis of a subsequent search by warrant, it must show that the warrantless search falls within one of the few specifically established and well delineated exceptions. See *United States v. Barnett*, 989 F.2d 546, 554 (1st Cir.), *cert. denied*, 510 U.S. 850, 114 S.Ct. 148, 126 L.Ed.2d 110 (1993) (citing *Schneckloth*, 412 U.S. at 218, 93 S.Ct. at 2041). Probable cause must also exist in conjunction with the recognized exception. *United States v. Cresta*, 825 F.2d 538, 553 (1st Cir.1987), *cert denied sub nom Impemba v. United States*, 486 U.S. 1042, 108 S.Ct. 2033, 100 L.Ed.2d 618 (1988).

A consensual search is one of the established and well-delineated exceptions to both the warrant and probable cause requirements. *Schneckloth*, 412 U.S. at 219, 93 S.Ct. at 2043–44 (citing *Davis v. United States*, 328 U.S. 582, 593–94, 66 S.Ct. 1256, 1261–62, 90 L.Ed. 1453 (1946)). See also *United States v. Patrone*, 948 F.2d 813, 815–16 (1st Cir.1991), *cert. denied*, 504 U.S. 978, 112 S.Ct. 2953, 119 L.Ed.2d 575 (1992). The Government has the burden of proving that such consent was voluntary. *Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983). The determination of "whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Schneckloth*, 412 U.S. at 227, 93 S.Ct. at 2047–48; see also *United States v. Mendenhall*, 446 U.S. 544, 557, 100

S.Ct. 1870, 1879, 64 L.Ed.2d 497 (1980); *United States v. Zapata,* 18 F.3d 971, 977–78 (1st Cir.1994). A consent is not voluntary if it is coerced by threats or force or granted only in submission to a claim of lawful authority. *Schneckloth,* 412 U.S. at 233, 93 S.Ct. at 2050.

▮▮▮▮ In *Barnett,* the First Circuit said the following with respect to the determination of a voluntary consent to search:

> Among the individualized factors bearing on the vulnerability of the consenting party are age, education, experience, intelligence and knowledge of the right to withhold consent. More general considerations include whether the consenting party was advised of his or her constitutional rights and whether permission to search was obtained by coercive means or under inherently coercive circumstances.

*Id.,* 989 F.2d at 555. It is not necessary for the police to inform the subject of the search of his right to refuse. *Schneckloth,* 412 U.S. at 231–32, 93 S.Ct. at 2049–50. "Rather, it is only by analyzing all the circumstances of an individual consent that it can be ascertained whether in fact [the search] was voluntary or coerced. It is this careful sifting of the unique facts and circumstances of each case that is evidenced in our prior decisions involving consent searches." *Id.* at 233, 93 S.Ct. at 2050.

▮▮▮ The Government contends that the entire series of events which transpired on February 21, 1995 with respect to the police entry into Apartment I is based on a consensual search. Trooper Spellacy testified that Mr. Rodriguez expressed himself clearly and intelligently, that he initiated discussion of warrants by asking whether the police officer had a "paper," which was clarified as an inquiry regarding a warrant, a topic which had not been broached before Mr. Rodriguez asked the question. Mr. Rodriguez therefore knew, the Government argues, of his right to refuse before he gave consent. See *Barnett,* 989 F.2d at 556 (defendant's comments reflected an understanding that agents had no search warrant and needed his consent).

Furthermore, the Government asserts that an examination of the surrounding circum-

stances reveals no course of intimidating behavior or atmosphere. Spellacy testified that he identified himself as an officer, stated his purpose, and asked whether he and his fellow officers could come in and look around. Spellacy did not force the door open wider than Mr. Rodriguez had opened it, nor did he enter until he believed that Mr. Rodriguez gave his consent. Moreover, the Government argues, Mr. Rodriguez was in his own home in an apartment complex with his wife, not alone in an unfamiliar, remote surroundings. See *Schneckloth,* 412 U.S. at 247, 93 S.Ct. at 2058 ("since consent searches will normally occur on a person's own familiar territory, the specter of incommunicado police interrogation in some remote station house is simply inapposite"). Mr. Rodriguez was not subject to repeated or prolonged requests for entry, nor was he in custody or under any physical restraint whatsoever. Compare *Barnett,* 989 F.2d at 554 (sensitivity to heightened possibility of coercion appropriate where consent obtained during custody).

Defendant Rodriguez, relying on the affidavits and testimony of his parents, asserts that no consent was given by his father to search the apartment. His father, Rodriguez argues, was never told that he had a right to withhold his consent and he was given no consent form to sign. The nature of the police officer's entry contributed to his father's confusion, intimidation and fright. Most importantly, Rodriguez argues that the police had their guns drawn and that, even if his father consented to the search, the consent was coerced.

In the Court's view, the constitutionality of this warrantless search comes down to two factors—whether Mr. Rodriguez, by his words and actions, consented to the search and whether any consent which might have been given was coerced. With respect to these questions, the testimony is somewhat contradictory, and the Court must necessarily make determinations of credibility.

Spellacy specifically testified that Mr. Rodriguez, after the initial part of the conversation with him, shrugged his shoulders and said "okay" as he turned and allowed him and the other police officers to enter the

apartment. Rodriguez, however, asserts that no verbal consent was given, citing the affidavits of both of his parents which emphatically deny there was any consent to search the home. Mr. Rodriguez's testimony under oath, however, is not so clear. On direct examination by his attorney, Mr. Rodriguez testified as follows:

Q. And he said to you, what, Mr. Rodriguez?

A. He said to me that can they look around the apartment and I say, yeah, because (inaudible).

T3 at 12. While Mr. Rodriguez subsequently testified that he did not actually give consent, his initial testimony corroborates the testimony of Spellacy that a verbal assent was given to the search.

■ Even if Mr. Rodriguez had simply shrugged his shoulders and stepped aside without verbalizing his okay, his consent was evident. An objective manifestation of consent to a warrantless search may include a gesture such as stepping away after opening a door. *Robbins v. MacKenzie*, 364 F.2d 45, 49 (1st Cir.), *cert. denied*, 385 U.S. 913, 87 S.Ct. 215, 17 L.Ed.2d 140 (1966). See also *McLain v. Milligan*, 847 F.Supp. 970, 975 (D.Me.1994). Here, the police did not misstate their purpose in seeking entry. It was a legitimate objective founded on probable cause. Enough time passed for Mr. Rodriguez to inquire about a "paper," i.e., a search warrant, and the police, at least verbally, threatened no force. The police need not have done more given the circumstances. In any case, the Court has before it "evidence of express consent, along with evidence of consent inferable from conduct." *Zapata*, 18 F.3d at 977.

Spellacy's failure, as Rodriguez notes, to inform Mr. Rodriguez of his right to refuse permission, though relevant to the issue of voluntariness, does not preclude a finding of consent. See, e.g., *Schneckloth*, 412 U.S. at 231–32, 249, 93 S.Ct. at 2049–50, 2059. Mr. Rodriguez was well enough aware that a search warrant could be required and he chose to allow entry. Nor was the search overbroad, as Rodriguez claims. The police were looking for three individuals and they proceeded to search the apartment with that goal in mind. Mr. Rodriguez's general consent was a consent to search the entire apartment.

Mr. Rodriguez's limited formal education does not alter the Court's finding of consent. Furthermore, Mr. Rodriguez's command of English was more than sufficient. Despite assertions to the contrary, there is no real linguistic dispute here. Compare *United States v. Gaviria*, 775 F.Supp. 495, 502 (D.R.I.1991) (record in the case "reflects too much confusion and too little comprehension for the defendant's consent to have been voluntarily given.") The conversation proceeded in English with no language problems. Mr. Rodriguez also testified in English at the suppression hearing. Finally, in light of all the circumstances, Mr. Rodriguez's cognitive abilities, given the interchange with Spellacy, were not compromised by his having been drinking earlier. See *United States v. Wilkinson*, 926 F.2d 22, 24 (1st Cir.), *cert. denied*, 501 U.S. 1211, 111 S.Ct. 2813, 115 L.Ed.2d 985 (1991).

■ More problematical, however, is whether Mr. Rodriguez's consent was coerced. In this regard, the question of whether the guns of Spellacy or the other police officers were drawn when Mr. Rodriguez answered the door is significant. While Defendant Rodriguez argues that coercion would have been present even had the guns not been drawn, the fact that the guns may have been drawn is key to his motion. As indicated, Spellacy testified that his gun was not drawn, although he was unaware if the other officers' guns were drawn. Both Mr. and Mrs. Rodriguez, however, testified that the guns of Spellacy and the other officers were drawn when Spellacy conversed with Mr. Rodriguez at the apartment door.

The Court is inclined to believe the Rodriguezes that at least some of the officers' guns were in fact drawn. A drive-by shooting had occurred and an abandoned vehicle was found with its rear window shattered. It was from that vehicle that three individuals were observed running into the apartment building. Spellacy had set up a perimeter around the building with quite a number of police officers present. Spellacy and the other officers approached Apartment I only after all

the other units in the building had been approached. Furthermore, a downstairs tenant specifically identified Apartment I as the unit into which she believed the three individuals, carrying weapons, had entered. Given these facts, it would not have been unreasonable, unaware of what lie on the other side of the door, for the police to approach Apartment I with guns drawn.

Indeed, Spellacy himself testified that, at the time he went to the apartment looking for three people with guns, his "primary concern at that point was not who they were, but protection of me and the other officers that were there." T1 at 64. See also T1 at 92–93. As indicated, he deemed those armed individuals to be dangerous and, fearing for his safety, he later drew his gun as he walked down the hall towards the partially opened door of Rodriguez's bedroom. Spellacy testified as follows on cross-examination:

Q. Okay, and why did you draw your weapon before going into that room?

A. Because of the fact that obviously in my opinion the two folks that I met at the door, Mr. and Mrs. Rodriguez were not the people we were interested in, number one. Information that I had gotten previously indicated that if someone, if a prior officer had gone to that apartment, he or she was told that no one was in there fitting the description of the people we were looking for.

Q. Is it fair—excuse me—go ahead.

A. When I approached the apartment door, and I should say the bedroom door, I drew my weapon before I entered the room.

T1 at 58. It would have been equally reasonable for his gun, and the guns of the other officers, to have been drawn at the closed front door of the apartment. In fact, Spellacy was unaware if the guns of the other officers were drawn at the time they stood at the apartment door.

Assuming then that the guns were drawn, the issue, as indicated, is whether Mr. Rodriguez's consent to search was obtained by coercive means or under coercive circumstances. Although the case is close, the Court thinks not. Even though Mr. Rodriguez was frightened and had never seen so many guns in his life, T3 at 15–16, the Court is convinced that his consent to the search was not the result of any coercion. Putting aside Mr. Rodriguez's admitted lack of recall with respect to several specific events of that evening, T3 at 31, he did not describe any particular coercion. Rather, his testimony demonstrates acquiescence to the search.

 While "mere submission to a claim of lawful authority" cannot prove consent, *United States v. Gallego–Zapata*, 630 F.Supp. 665, 675 (D.Mass.1986), Mr. Rodriguez's actions go well beyond such submission. He was clear that the police were looking for three men, he inquired about a search warrant and he did so even though, believing his testimony, all the officers had their guns drawn. He shrugged his shoulders, turned aside and verbalized his assent to the search. "Bowing to events, even if one is not happy about them, is not the same thing as being coerced." *Robbins*, 364 F.2d at 50. See also *Gorman v. United States*, 380 F.2d 158, 165 (1st Cir.1967); and *United States v. Davis*, 638 F.Supp. 472, 479 (D.Mass.1986).

While it makes little difference with respect to the degree of coercion required to overcome a consensual search, the fact that Mr. Rodriguez was not himself the target of the search may well have played a role in his consent. Believing his and his wife's testimony that they were unaware of the presence of anyone else in the apartment, Mr. Rodriguez may well have concluded that he had nothing to hide. See *Coolidge*, 403 U.S. at 489, 91 S.Ct. at 2049. That Mr. Rodriguez thereafter "withdrew" his consent, when his son and two others were discovered and arrested in the rear bedroom, plays no part in the voluntariness of his original consent. Although there is an "inherently unnerving effect of having numerous officers arrive at one's door with guns drawn," *Barnett*, 989 F.2d at 556, the totality of circumstances here indicate that Mr. Rodriguez's "will was not overborne nor was his 'capacity for self-determination critically impaired.'" *Id.* (quoting *Schneckloth*, 412 U.S. at 225, 93 S.Ct. at 2046–47).

 Nor was the consent tainted because Spellacy informed Rodriguez that he could obtain a search warrant. While police may

not threaten to obtain a search warrant when there are no grounds for a valid one, "[w]hen the expressed intention to obtain a warrant is genuine ... and not merely a pretext to induce submission, it does not vitiate consent." *United States v. White*, 979 F.2d 539, 542 (7th Cir.1992). See also *United States v. Miller*, 589 F.2d 1117, 1132 n. 13 (1st Cir. 1978) (good faith assertion by police officer that he would seek warrant if suspect did not consent to search does not make suspect's subsequent consent involuntary), *cert. denied*, 440 U.S. 958, 99 S.Ct. 1499, 59 L.Ed.2d 771 (1979). At the time Spellacy informed Rodriguez that he could get a search warrant, he knew that three individuals had been seen leaving a vehicle which was later abandoned, that the vehicle matched a description of a vehicle in a drive-by shooting, that its rear window was blown out, that shell casings were seen inside the car, that three individuals entered the apartment building and that those individuals were then observed going upstairs with weapons and heard to enter the upstairs apartment. Probable cause sufficient for the issuance of a search warrant was present. If, at least in partial response to Spellacy's statement, Mr. Rodriguez consented to the search, the consent remains no less voluntary. See *United States v. Morris*, 977 F.2d 677, 688 (1st Cir. 1992) (consent to search briefcase given after individual stated: " 'I was told that they would get a court order to open it anyway so I just went ahead and told them that they could go ahead and open it to prevent damage to the briefcase ...' "), *cert. denied*, 507

U.S. 988, 113 S.Ct. 1588, 123 L.Ed.2d 155 (1993).

▆▆▆▆ In sum, the totality of circumstances leads the Court to conclude that Spellacy obtained Mr. Rodriguez's voluntary consent to search and that that consent was not coerced. Compare *United States v. Talkington*, 843 F.2d 1041 (7th Cir.1988) (coercion question remanded for an evidentiary hearing when government agents burst into the home, at night, with weapons drawn, falsely claimed they were in process of obtaining a search warrant and repeatedly threatened to conduct a body search of defendant's wife). Finding that the warrantless search was undertaken by the police with consent, the second search, made once consent was withdrawn and pursuant to a warrant, was proper. Probable cause to issue the search warrant for that second search was based on observations made during the first search. The information in the supporting affidavit was not tainted. Rodriguez's motion to suppress physical evidence resulting from the searches should therefore be denied.[2]

## III. MOTIONS TO SUPPRESS RODRIGUEZ'S AND TORRES' POST–ARREST STATEMENTS

### A. Facts

#### 1. Rodriguez's statements of February 21–22, 1995

After Rodriguez was arrested by the state police on February 21, 1995, he was trans-

---

**2.** Since the Court has found that the consent to search was voluntary and uncoerced, it need not address the Government's other argument that the warrantless search of the apartment was excused by exigent circumstances. "Exigent circumstances exist where law enforcement officers confront a compelling necessity for immediate action that would not brook the delay of obtaining a warrant." *United States v. Tibolt*, 72 F.3d 965, 969 (1st Cir.1995) (quoting *U.S. v. Wilson*, 36 F.3d 205, 209 (1st Cir.1994)). The Court notes that this argument goes beyond being a single alternative; it flatly contradicts the testimony of Trooper Spellacy who never once relied on an exigent need to search the apartment. Indeed, he indicated to Mr. Rodriguez that he could get a warrant if need be. His concerns about safety appeared to have been addressed towards locating the suspected firearms once the three individuals were actually found in the apartment. And even though the firearms were

not located, Trooper Spellacy, together with other law enforcement personnel, sought a search warrant once Mr. Rodriguez's consent to the search was "withdrawn." Thus, if the Court had to, it would find that the Government did not meet its burden of demonstrating exigent circumstances sufficient to "overcome the presumption of unreasonableness that attaches to all warrantless home entries." *Welsh v. Wisconsin*, 466 U.S. 740, 740, 104 S.Ct. 2091, 2093, 80 L.Ed.2d 732 (1984). See also *United States v. Donlin*, 982 F.2d 31 (1st Cir.1992) (exigent circumstances to search existed when police were confronted by the defendant, intoxicated and in possession of a shotgun); *Hegarty v. Somerset County*, 53 F.3d 1367, 1374 (1st Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 675, 133 L.Ed.2d 524 (1995); *Roy v. Inhabitants of Lewiston*, 42 F.3d 691, 695 (1st Cir.1994); and *United States v. Bartelho*, 71 F.3d 436, (1st Cir.1995).

ported to the Holyoke police station and, while being booked, made several statements. One statement, made to no one in particular, was offered while Rodriguez was at the booking desk. As Thomas R. Lyster, Special Agent of the Bureau of Alcohol, Tobacco and Firearms, reported, he "observed Mark Rodriguez lean down, put his head on the booking desk and say 'I got in a fight earlier. That's what this is all about.'" See Government's Consolidated Response to Defendants' Motions to Suppress and Torres' Motion to Dismiss (Docket No. 87), Exhibit A. See also T2 at 7–8.

Rodriguez later made other statements in the photo room. As Agent Lyster reported:

Rodriguez told Trooper Soto and I that he was with a girl in her apartment until he came home that night. He said he doesn't know her name and that he just met her that day. Rodriguez told us the name of the street in Holyoke that the apartment was on, but I don't remember it. Additionally, Rodriguez was upset about his father being arrested. Rodriguez told me that his father was asleep on the couch when he, Torres and Hernandez came in the apartment and he didn't know anything about what was going on.

Id. See also T2 at 8–9. Agent Lyster testified that the statement at the booking desk and all but one of the statements in the photo room were made by Rodriguez spontaneously, without Lyster saying or asking him anything to prompt the statements. T2 at 9–10. Only Rodriguez's statement with respect to not knowing the girl's name was made as the result of Lyster's inquiry. T2 at 9. Rodriguez now seeks to suppress all of these statements, asserting that they were obtained in violation of the rights secured by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

*2. Torres' statements of February 21, 1995*

Torres also moves to suppress a statement he made to Spellacy shortly after his arrest on state charges. As he was about to place Torres in a cruiser for transport to the police station, Spellacy asked Torres where the guns were. T1 at 75, 80–81. Torres started to cry and stated that the guns were in the

bedroom. T1 at 81–82. In response, the Government claims that both Torres' and Rodriguez's statements were made after both defendants had been provided *Miranda* warnings and had knowingly and intelligently relinquished or abandoned their rights.

The sum total of the *Miranda* warnings given Torres, and for that matter Rodriguez, on February 21, 1995 was described by Spellacy. First, on direct examination, Spellacy testified with respect to events in Rodriguez's bedroom:

Q. After the Defendants were secured, did there come a time when *Miranda* Warnings were administered?

A. *Miranda* Warnings were administered in English at that time. Someone said, and it might very well have been Mark Rodriguez, that one of the other people in the room, Keith Hernandez [the third individual arrested that night], did not speak English. At that point, Officer Vasquez advised all three subjects in Spanish of the *Miranda* Warnings. That was done in the bedroom.

Q. And after the subjects were advised of their *Miranda* Rights, Officer, what happened next, what was the next step that you took?

A. After each officer was advised of his *Miranda* Warnings, by the officers of their *Miranda* Warnings, the individuals were taken downstairs, placed in cruisers and transported to the Holyoke Police Department.

T1 at 20–21. Later, after describing the events which led to the search of the bedroom, Spellacy testified on cross-examination by Torres' counsel as follows:

Q. Do you remember—I'll withdraw that. At some point in time, did my client tell you or did somebody tell you that my client didn't speak English?

A. That did come up at one point and this was after the *Miranda* Warnings were given in English. The question came up as to whether or not I think it was Mr. Hernandez that didn't speak English. At that point, Officer Vasquez advised all three boys, or at least two,

**922**

not Mark [Rodriguez], but the other two that of their rights in Spanish.

Q. Did you inquire of my client how far he went in school?

A. No.

Q. Did you inquire—is it fair to say that you were meeting Mr. Torres for the first time?

A. Yes.

Q. And you didn't have any knowledge at that time as to whether or not he had been arrested on prior occasions?

A. I had no knowledge of Mr. Torres. I had no conversation basically with him while we were in the apartment, no.

Q. And who was it that gave my client his *Miranda* Warnings?

A. At the time I believe I did, initially, in English.

Q. And where do you say you were at the time you gave those warnings?

A. In the bedroom.

Q. Did you, at the time that you were in that bedroom, did my clients give you any statements?

A. No.

T1 at 72–73. Later, Spellacy continued to testify on cross examination:

Q. As you were giving my client his, his *Miranda* Warnings, you didn't know whether he spoke English or not, is that fair to say?

A. Well, I would, yeah, I think so, that's fair to say.

Q. And he did not respond to you at the time that you read him those or told him of his rights inside the apartment?

A. That's correct.

Q. And is it fair to say you didn't show him a *Miranda* card at the time inside the apartment?

A. I didn't, no.

Q. And you continued to ask him questions—

A. As I said, no.

Q. Whether or not there were any guns in the apartment?

A. No, no. He was advised in English. And within seconds or minutes of his being advised in English, someone said that Hernandez did not speak English. At that point, and this is within seconds, minutes, or when the individuals were secured, Officer Vasquez advised at least two, Eric Torres and Hernandez of their *Miranda* Warnings in English.

Q. And while Mr. Torres was inside the apartment, he never expressed that he understood these rights?

A. He never expressed them to me in English. He may have expressed them to Officer Vasquez. I don't know.

Q. You didn't hear anything that you understood to be a waiver of his rights inside the apartment?

A. I don't know. I didn't hear anything of that.

T1 at 78–79. Trooper Spellacy then continued:

Q. At some point, when you were out by the cruiser, you asked him again, where are the guns. Is that correct?

A. I asked him, are there any guns in the apartment?

Q. In your answer to that, your testimony, is that his answer was that there were guns in the apartment. Is that correct?

A. They're in the bedroom.

Q. They're in the bedroom. And prior to that time he had not told you either that he understood his right to remain silent or that he waived his right to remain silent, is that right?

A. He was advised twice in English and Spanish.

Q. Inside the apartment?

A. Correct.

Q. So another officer is advising him in Spanish?

A. That was Officer Vasquez. It was my belief at that time that he was advised and understood his rights.

Q. But you, yourself, don't speak Spanish?

A. I speak Spanish on a limited basis.

Q. But you don't, you didn't understand what, if anything, Mr. Torres said to Officer Vasquez inside the apartment, inside the bedroom?

A. I wasn't paying real strict attention to what he said to Officer Vasquez. I knew that Officer Vasquez was advising him of his rights because we made a specific point to advise a young man of their rights in Spanish.

T1 at 81–82. Spellacy went on to indicate that he never had Torres sign a *Miranda* warning sheet nor had he ever subsequently seen a *Miranda* warning sheet bearing Torres' signature. T1 at 82–83. There is no other testimony with respect to *Miranda* warnings given either to Torres or Rodriguez.

### 3. Rodriguez's statements on May 26, 1995

Finally, Rodriguez seeks to suppress the statements he made after he was arrested by Agent Lyster on a federal arrest warrant on May 26, 1995 for illegal possession of an unregistered firearm. Agent Lyster had been involved with the case and its investigation since February 21, 1995 and was aware of the parallel state charges. T2 at 21–22. He was also aware that Rodriguez had retained counsel on the state charges. Id.

Rodriguez was arrested and brought to the state police barracks on Armory Street in Springfield in the middle of the night pending contact with the United States Marshal Service. T2 at 11. Lyster administered a *Miranda* warning to Rodriguez and Rodriguez signed the warning card. T2 at 11–13. The *Miranda* warning indicated the right to have an attorney present. T2 at 24. Shortly thereafter, Rodriguez was transported to the Marshal's office in the Federal building. Lyster then proceeded to discuss with Rodriguez the circumstances of the evening of February 21, 1995. T2 at 13–14. Knowing that he was represented by counsel on the state charges at that time, Lyster still asked Rodriguez questions after the *Miranda* warning. T2 at 24. Rodriguez proceeded to

tell Lyster that two of his friends, including co-defendant Torres, had purchased the firearms in sawed-off condition on the street, that they stored them in his bedroom because he had an F.I.D. card, that they were just "hanging out" playing with the firearms with the windows open before the police came, and that, as a result, they thought someone may have called the police—leading to his pretending to sleep when the police arrived. T2 at 13–16. Rodriguez also said that he had avoided the police thereafter, knowing they were looking for him, because his girlfriend was pregnant and he wanted to see his child born. T2 at 16–17.

### B. Discussion: Torres

With respect to Torres, there is no question that his statement in response to Spellacy's question with regard to the guns was made while he was in custody. A defendant's statements made while subject to custodial interrogation are admissible at trial only if the defendant knowingly and voluntarily waived his constitutional rights respecting his privilege against self-incrimination. See *Miranda*, 384 U.S. at 436, 86 S.Ct. at 1602; and *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). In order to prove a valid waiver, the Government must show first that the relinquishment of the defendant's rights was voluntary; and second, that the defendant had "full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1986).

A defendant's waiver of his rights need not be expressly stated or written:

An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver. The question is not one of form, but rather whether the Defendant in fact knowingly and voluntarily waived the rights delineated in the *Miranda* case.

*North Carolina v. Butler*, 441 U.S. 369, 373, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286 (1979).

The Government must prove by a preponderance of the evidence that a suspect waived his or her constitutional rights, *Colorado v. Connelly,* 479 U.S. 157, 168, 107 S.Ct. 515, 522, 93 L.Ed.2d 473 (1986), and that the statement was voluntary under the totality of the circumstances, *Sims v. Georgia,* 385 U.S. 538, 544, 87 S.Ct. 639, 643, 17 L.Ed.2d 593 (1967). See also *United States v. Montgomery,* 714 F.2d 201, 203 (1st Cir.1983) (the Government bears a heavy burden in demonstrating waiver).

Here, the Government has provided no proof that Torres both understood his rights and knowingly waived them. At best, the Government can argue that the *Miranda* warning was given to Torres, and Rodriguez for that matter, in the bedroom of Rodriguez's home. Indeed, there is even a question as to whether or not Torres understood the warning when first given in English. From that point on—until Spellacy asked Torres where the guns were, approximately fifteen minutes later and after Torres had been brought out of the apartment and down to Spellacy's cruiser—Torres remained silent.

 As the Supreme Court has indicated, "[t]he requirement of warnings and waiver of rights is fundamental with respect to the Fifth Amendment privilege and not simply a preliminary ritual to existing methods of interrogation." *Miranda,* 384 U.S. at 476, 86 S.Ct. at 1629. The First Circuit echoes that sentiment: "[m]erely giving warnings to an accused does not satisfy the duties of an interrogating officer or make any statement the accused might then make admissible." *United States v. Christian,* 571 F.2d 64, 67 (1st Cir.1978). As the First Circuit explains:

> The warnings guarantee that the accused knows what his rights are. But *Miranda* requires the interrogating officer to go further and make sure that the accused, knowing his rights, voluntarily relinquishes them. The accused's "freedom to decide whether to assist the state in securing his conviction", *In re Gault,* 387 U.S. 1, 47, 87

S.Ct. 1428, 1454, 18 L.Ed.2d 527 (1967), cannot otherwise be protected fully.

*Id.,* at 68.

 Here, although there is little question that Torres was warned of his *Miranda* rights, there is no evidence that he acknowledged or understood them, let alone waived them. Compare *United States v. Garcia,* 983 F.2d 1160, 1169 (1st Cir.1993) (court properly concluded that defendant was advised on his rights, understood them and knowingly waived them). The privilege against self-incrimination must be voluntarily relinquished, and "a valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained." *Miranda,* 384 U.S. at 475, 86 S.Ct. at 1628. See also *United States v. Porter,* 764 F.2d 1, 7 (1st Cir.1985) (*Miranda* requires an officer to go further than just asking accused if he understands his rights; the officer must make sure that the accused, knowing his rights, voluntarily relinquishes them).

Torres made no affirmative statement, gave no hint of his willingness to talk and did not indicate that he waived his rights. The Court sees no evidence of anything, external or internal, that supports a finding of a knowing and intelligent abandonment of Torres' right to remain silent. Indeed, Torres maintained his silence from the time of the initial warning until Spellacy, without restating the *Miranda* warning, initiated a conversation and proceeded to question him.

Finally, Spellacy's question to Torres as to the location of the firearms does not fall into the public safety exception to *Miranda* warnings set forth in *New York v. Quarles,* 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984). While the Government argues that a *Miranda* warning was not required in the present circumstances, it disregards the fact that Spellacy's inquiry came *after* all three individuals had been arrested in the apartment and given such warnings. It is true that Spellacy, in the act of apprehending the suspects, had asked previously where the guns were. Had Torres then answered, Spellacy's inquiry may well have fallen within the exception established by *Quarles.* See

Reiner, Marc Schuyler, *The Public Safety Exception to Miranda, Analyzing Subjective Motivation,* 93 Mich.L.Rev. 2377 (1995). That simply is not the case here. See *United States v. Colon Osorio,* 877 F.Supp. 771, 776 (D.P.R.1994) (nonverbal admission improperly obtained when gun had been seized by FBI agents and arrest scene was under the agent's control). Given all the circumstances, once Torres was arrested and provided a *Miranda* warning, the public safety exception no longer provided protection for Spellacy's question concerning the location of the guns, a question he asked approximately fifteen minutes later after Torres was secured. Since Torres' response does not fall under any exception to the *Miranda* rule, it should be suppressed.

## C. Discussion: Rodriguez's February 1995 Statements

 Rodriguez's statement at the booking desk, with respect to getting into a fight earlier, and his statement in the photo room that he was with a girl in her apartment until he came home that night, were made voluntarily and without inquiry by the police and ought not be suppressed. His other statements in the photo room raise more of a problem, however. Agent Lyster testified that, in response to his inquiry, Rodriguez said he did not know the girl's name with whom he had been and that he had just met her that day. The other statements—with regard to the name of the street where the girl's apartment was, that he was upset about his father being arrested and, most particularly, that his father was asleep on the couch when he, Torres and Hernandez came into the apartment and that his father didn't know anything about what was going on—all followed Lyster's inquiry.

 The Court finds, however, that Rodriguez's statements did not result from custodial interrogation. While Lyster's inquiry with regard to the girl's name extended the conversation somewhat, there was no other express questioning. "The Fifth Amendment does not bar the admission of volunteered statements." *Montgomery,* 714 F.2d at 202 (citing *Miranda* ). And Rodriguez's ongoing statements did not result from cus-

todial interrogation. The spontaneity of Rodriguez's statements were certainly not in response to any real interrogation nor has Rodriguez argued that the statements may have been compelled by the very fact of custody. Given the totality of the circumstances, the Government has met its burden that Rodriguez's statements represented a voluntary waiver of his *Miranda* rights.

## D. Discussion: Rodriguez's May 26, 1995 Statements

 Rodriguez argues that Lyster's questioning on May 26, 1995, despite the signed waiver of his *Miranda* rights, violated his Sixth Amendment right to counsel because he was already under indictment on state firearms charges and represented by counsel with respect to those charges. Rodriguez argues that his right to counsel attached at or after the initiation of any "adversary criminal proceeding." See *Kirby v. Illinois,* 406 U.S. 682, 682, 92 S.Ct. 1877, 1879, 32 L.Ed.2d 411 (1972). Once adversary proceedings have begun, a defendant may not be interrogated in the absence of counsel, nor be induced into making incriminating statements unless he freely chooses to waive his rights. *Brewer v. Williams,* 430 U.S. 387, 400, 97 S.Ct. 1232, 1240, 51 L.Ed.2d 424 (1977); and *United States v. DeWolf,* 696 F.2d 1 (1st Cir.1982). Since Rodriguez was arrested on state charges on February 21, 1995, and assigned counsel at his arraignment shortly thereafter, he argues that his right to counsel was abrogated at the time he was questioned by Lyster after his arrest on parallel federal charges.

In *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), the Supreme Court barred the Government from using against a defendant at trial "evidence of his own incriminating words, which [the Government has] deliberately elicited from him after he [has] been indicted and in the absence of his counsel." *Id.,* 377 U.S. at 206, 84 S.Ct. at 1203. The reason for the *Massiah* rule, the First Circuit has indicated, is that the "use of such evidence would interfere with the defendant's right to counsel by depriving him of the benefit of counsel's advice as to everything he says to the govern-

ment concerning the offense that might be used in his prosecution." *DeWolf,* 696 F.2d at 3. The First Circuit went on, however, and cautioned "that *Massiah* does not prevent the government from introducing defendant's statements relating to a separate crime when obtained in the good faith investigation thereof." *Id.* (citing *Grieco v. Meachum,* 533 F.2d 713, 717–18 (1st Cir.), *cert. denied sub. nom. Cassesso v. Meachum,* 429 U.S. 858, 97 S.Ct. 158, 50 L.Ed.2d 135 (1976)).

In that vein, the Government argues that Rodriguez's Sixth Amendment right had not attached to the federal charges for which he was in custody. The Sixth Amendment right to counsel, the Government argues, attaches only after a defendant has been arraigned. *Michigan v. Jackson,* 475 U.S. 625, 629, 106 S.Ct. 1404, 1407, 89 L.Ed.2d 631 (1986). "The arraignment signals 'the initiation of adversary judicial proceedings' and thus the attachment of the Sixth Amendment." *Id.* (quoting *United States v. Gouveia,* 467 U.S. 180, 187, 104 S.Ct. 2292, 2297, 81 L.Ed.2d 146 (1984)).

Furthermore, the Government argues, Sixth Amendment rights are offense-specific. The Government cites *McNeil v. Wisconsin,* 501 U.S. 171, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991), in which the Supreme Court held that the Sixth Amendment does not bar the police from questioning a suspect, who has been advised of and has waived his *Miranda* rights, about an offense with which the suspect has not yet been charged, even if the suspect has requested and is represented by a lawyer in connection with other offenses in which he has been charged. *Id.* at 175–82, 111 S.Ct. at 2207–11. The questioning in the present matter, the Government continues, relates to federal firearms offenses involving different elements from the state charges and brought by a separate sovereign.

In this Court's opinion, however, the "offense-specific" language in *McNeil* does not necessarily bar the application of the Sixth Amendment in the present matter. As the Ninth Circuit Court of Appeals recently discussed, there is language in *McNeil* that can be read as supporting either the Government's or the defendant's position:

It is true, as the United States notes, that *McNeil* states that *Jackson's* effect is "offense-specific," *McNeil,* [501 U.S. at 174–76] 111 S.Ct. at 2207, and that this phrase could reasonably be interpreted as limiting [defendant's] Sixth Amendment protection to the state ... offense. It is also true, however, that *McNeil* relied on [*Maine v.*] *Moulton,* [474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985)], which in turn focused on the existence of " 'new or additional crimes.' " *McNeil,* [501 U.S. at 174–76] 111 S.Ct. at 2207 (quoting *Moulton,* 474 U.S. at 179, 106 S.Ct. at 489). This language could reasonably be read as suggesting that *Jackson* does apply to [defendant], because the federal questioning concerned no new or additional crime of [defendant].

*United States v. Martinez,* 972 F.2d 1100, 1103 (9th Cir.1992). In fact, the Ninth Circuit previously suggested that "[a]n exception to the offense-specific requirement of the Sixth Amendment occurs when the pending charge is so inextricably intertwined with the charge under investigation that the right to counsel for the pending charge cannot constitutionally be isolated from the right to counsel for the uncharged offense." *United States v. Hines,* 963 F.2d 255, 257 (9th Cir. 1992).

As in *Martinez,* the dispositive issue here regarding the Sixth Amendment claim is whether, in light of *McNeil* and *Moulton,* *Jackson* applies to the federal authorities' interrogation of Rodriguez. In this Court's opinion, it does. Indeed, the instant case presents facts far more within the ambit of *Jackson* than those presented in *Martinez.* Not only do the state and federal charges in the present matter arise from identical conduct, but the state charges remained outstanding at the time of the federal interrogation. To this day, those state charges include, but are not limited to, possession of a firearm, possession of an altered firearm and another firearm violation. While the elements of the crimes may differ somewhat, the state charges were outstanding at the time of Lyster's interrogation of Rodriguez and the state criminal apparatus was, and still is, functioning.

Thus, unlike the defendant in *Martinez,* whose state charge had been dismissed before the federal interrogation, the present case presents none of the complications noted by the Ninth Circuit in *Martinez.* Thus, as narrowly applied here, the Sixth Amendment protection would not be extended indefinitely into the future after an initial state charge had been dismissed. The Court agrees with the Ninth Circuit that such an infinite extension of the Sixth Amendment doctrine would improperly "require suppression of a statement given to federal authorities regarding a federal crime if, unbeknownst to the federal agents, the suspect had been charged for the same substantive act at some earlier time." *Martinez,* 972 F.2d at 1104. Here, however, the federal investigator was fully aware of the state charges against Rodriguez, had participated in a joint state-federal task force at the time of Rodriguez's arrest on those state charges, and was aware, or at least presumed, that Rodriguez was represented by counsel with respect to the state charges at the time of his federal interrogation.

While the Government acknowledges these facts, it argues that the Sixth Amendment right to counsel attaches only after defendant has been arraigned *on the federal charges.* In essence, then, the Government believes that the federal agent had a window of opportunity, in such instances as represented by the facts here, between the time of Rodriguez's federal arrest and his arraignment on federal charges, to question him after he waived his *Miranda* rights. The Sixth Amendment right to counsel in the state matter, the Government argues, does not apply during that time period, and Rodriguez's representation by counsel for the pending state charges has no constitutional impact.

The First Circuit faced a somewhat similar issue in *United States v. Batista,* 834 F.2d 1 (1st Cir.1987). Batista, while cooperating with federal agents in the hope that a pending state sentence would be reduced, went beyond the bounds of a sting operation with respect to the purchase of cocaine. The federal grand jury then indicted Batista for possessing with intent to distribute more than one kilogram of cocaine in violation of federal law. Batista attempted to have the indictment dismissed on the ground that the federal agents had violated his Sixth Amendment right to counsel. Batista advanced what the First Circuit considered an untenable argument—that "since the federal crime for which he was convicted arose out of what he characterize[d] as a joint state-federal operation, his right to counsel also attached with regard to the federal charges as of the moment he was indicted on the state charges." *Id.* at 4. The First Circuit held, however that Batista's Sixth Amendment right to counsel, which had already attached with regard to the entirely separate state offense, did not protect him from an investigation by federal agents into "a later unrelated federal offense." *Id.* at 5. Batista's legal argument, the First Circuit found, would inappropriately immunize any such defendant from further prosecution.

While the facts in *Batista* showed two separate judicial criminal proceedings, the facts in the present matter are significantly different. First, the state and federal judicial proceedings arise out of the same set of facts, not the distinctly separate facts present in *Batista.* While the Double Jeopardy clause does not bar successive prosecutions by different sovereigns, such as the state and federal governments in the present matter, based upon the same wrongful act, it does not necessarily signify that the Sixth Amendment right to counsel has not attached. That the elements of the crimes may be somewhat different is both expected and immaterial for purposes here. Second, Mr. Rodriguez's statements here were made to Lyster *after* he had been indicted and arrested on federal charges, as distinct from the situation in *Batista* where the defendant sought to have his right to counsel attach even *before* his federal arrest or indictment. Thus, the facts here present none of the logistical issues with which the First Circuit was concerned in *Batista.*

The First Circuit revisited *Batista* in *United States v. Nocella,* 849 F.2d 33 (1st Cir. 1988), and again held that the pendency of a state indictment for one drug offense, to which the Sixth Amendment right to counsel had attached, did not preclude the federal

government from continuing to investigate the accused for separate and distinct federal drug offenses. The fact that the joint investigation by the federal and state authorities was concerned with drug violations did "not erase the obvious differences between the state crime of marijuana possession and federal offenses involving threats to a witness and distribution of cocaine." *Id.*, at 38. According to the court, "[t]he crimes arose out of different nuclei of operative fact, necessitated proof of different elements, and occurred at different times." *Id.*

Thus, the First Circuit held out the prospect, at least impliedly, that certain situations might cause it to treat state and federal offenses as one for purposes of Sixth Amendment protections. The state and federal offenses in *Nocella* were not, in the judgment of the First Circuit, "so inextricably intertwined as to demand that they be treated as an impartible unit." *Id.* And while the First Circuit found that the "breadth of the sixth amendment is not so vast as to enswathe this situation," *id.* at 39, it did not bar the Sixth Amendment, as it could have, from ever applying to state and federal offenses which are, in fact, "inextricably intertwined." Notably, that same phrase was used by the Ninth Circuit in *Martinez* and *Hines*.

For all the reasons set forth above, that inextricable bond is present here. The facts here are simply not present in either *Batista* or *Nocella*, or for that matter *McNeil* or *Martinez*, where the state and federal offenses were clearly distinct (*Batista, Nocella*), where the federal offense had not yet been charged (*McNeil*), and where the state charges had been dismissed prior to the federal investigation (*Martinez*). In contrast, the facts in the present matter demonstrate just how "inextricably intertwined" the federal and state prosecutions are. Unlike the cases cited, in which the state charges were either dropped prior to the federal prosecution or so distinct as to be inapplicable, the state charges here are indistinguishable from the federal charges and remain current. Thus, it can hardly be argued that the answers provided by Rodriguez to the federal interrogator could be used in the state court proceeding without running afoul of the Sixth

Amendment. Concommitantly, Rodriguez's statements should not be used in the indistinguishable federal prosecution either. Accordingly, Rodriguez's motion to suppress his statements of May 26, 1995, should be allowed.

## IV. TORRES' MOTION TO DISMISS

■ Finally, Torres moves to dismiss the indictment based on the alleged insufficiency of the evidence before the grand jury. Although Torres acknowledges the general rule that a defendant may not attack an indictment on grounds that the evidence presented to the grand jury was inadequate or incompetent, see, e.g., *Costello v. United States*, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1959), he argues that there are, nonetheless, certain circumstances where an indictment may be dismissed prior to trial. Specifically, Torres argues that, even if the facts as asserted by the Government are found to be true, there is insufficient evidence to find that he possessed a firearm as a matter of law. See *Costello*, 350 U.S. at 365, 76 S.Ct. at 409 (1959). As an example, Torres cites the Tenth Circuit, which recently upheld the dismissal of an indictment charging a defendant with possession of a firearm while committing a felony. *United States v. Hall*, 20 F.3d 1084 (10th Cir.1994). The court ruled that " 'it is permissible and may be desirable where the facts are essentially undisputed,' for the district court to examine the factual predicate for an indictment to determine whether the elements of the criminal charge can be shown sufficiently for a submissible case." *Id.* at 1087 (quoting *United States v. Brown*, 925 F.2d 1301, 1304 (10th Cir.1991)).

■ Under the applicable statute here, the Government must prove that Torres knowingly possessed a firearm not registered to him in the National Firearms Registration and Transfer Record. 26 U.S.C. § 5861(d). The First Circuit has ruled that "possession can be either actual or constructive, exclusive or joint." *United States v. Ladd*, 877 F.2d 1083, 1087 (1st Cir.1989) (citing *United States v. Flores*, 679 F.2d 173, 177 (9th Cir. 1982)), *cert. denied*, 459 U.S. 1148, 103 S.Ct. 791, 74 L.Ed.2d 996 (1983) and *United States v. Alverson*, 666 F.2d 341, 345 (9th Cir.1982).

"Constructive possession exists when a person ... knowingly has the power and the intention at a given time to exercise dominion and control over an object, either directly or through others." *Id.* at 1087 (quoting *United States v. Craven*, 478 F.2d 1329, 1333 (6th Cir.1973) and citing approvingly *United States v. Birmley*, 529 F.2d 103, 107 (6th Cir.1976) and *United States v. Daniels*, 527 F.2d 1147, 1150 (6th Cir.1975)). In *Birmley*, the Sixth Circuit ruled that "[m]ere presence on the scene plus association with illegal possessors is not enough to support a conviction for illegal possession of an unregistered firearm. Presence alone cannot show that knowledge, power or intention to exercise control over the unregistered firearms." *Id.*, 529 F.2d at 107 (citing *United States v. Craig*, 522 F.2d 29 (6th Cir.1975)). The cases relied upon by Torres, however, all concern the sufficiency of evidence at trial, not the question presented here—the dismissal of the grand jury indictment before the Government is put to its test at trial.

The Supreme Court has held that it is contrary to the basic function of the grand jury to permit judicial challenges to the adequacy of the evidence on which an indictment rests. Not only would litigation of such motions compromise grand jury secrecy in many cases, but "[a]ny holding that would saddle a grand jury with minitrials and preliminary showings would assuredly impede its investigation and frustrate the public's interest in the fair and expeditious administration of the criminal laws." *United States v. Dionisio*, 410 U.S. 1, 17, 93 S.Ct. 764, 773, 35 L.Ed.2d 67 (1973). See also *United States v. R. Enterprises, Inc.*, 498 U.S. 292, 298–99, 111 S.Ct. 722, 727, 112 L.Ed.2d 795 (1991). Rules that would allow the defendant to attack the sufficiency of the record before the grand jury would "make of the grand jury a pawn in a technical game instead of respecting it as a great historic instrument of lay inquiry into criminal wrongdoing." *United States v. Johnson*, 319 U.S. 503, 512, 63 S.Ct. 1233, 1237, 87 L.Ed. 1546 (1943).

In *Costello*, the Supreme Court relied on those considerations in holding that an indictment that is valid on its face is not open to attack on the ground that only hearsay evidence was presented to the grand jury. The court ruled broadly that, under the Fifth Amendment, "[a]n indictment returned by a legally constituted and unbiased grand jury ... is enough to call for trial of the charge on the merits." *Id.*, 350 U.S. at 363, 76 S.Ct. at 409 (footnote omitted). The court explained that "[i]f indictments were to be held open to challenge on the ground that there was inadequate or incompetent evidence before the grand jury, the resulting delay would be great indeed," because "before trial on the merits a defendant could always insist on a kind of preliminary trial to determine the competency and adequacy of the evidence before the grand jury." *Id.* The court similarly refused to invoke the supervisory power to allow "defendants to challenge indictments on the ground that they are not supported by adequate or competent evidence." *Id.* at 364, 76 S.Ct. at 409. Such an innovation, the court stated, would conflict with the history of the grand jury as a body whose inquiries are not governed by "technical rules." *Id.* Moreover, the Court noted, there is no reason to permit such challenges to the indictment because defendants are guaranteed a fair trial on the merits by the procedural protections that apply in that setting. *Id.*

■ As the Supreme Court further explained in *Ex parte United States*, 287 U.S. 241, 250, 53 S.Ct. 129, 131, 77 L.Ed. 283 (1932), "the finding of an indictment, fair upon its face, by a properly constituted grand jury, conclusively determines the existence of probable cause for the purpose of holding the accused to answer." See also *Bank of Nova Scotia v. United States*, 487 U.S. 250, 261, 108 S.Ct. 2369, 2377, 101 L.Ed.2d 228 (1988); and *Ewing v. Mytinger & Casselberry, Inc.*, 339 U.S. 594, 599, 70 S.Ct. 870, 873, 94 L.Ed. 1088 (1950) (grand jury's decision to indict "is conclusive on the issue of probable cause. As a result the defendant can be arrested and held for trial" without any judicial intervention). In addition, the First Circuit has held that an indictment is not subject to attack based on the sufficiency of the evidence before the grand jury. See *United States v. Latorre*, 922 F.2d 1, 7 (1st Cir.1990) (claim that grand jury's decision to indict is subject to review based upon sufficiency of evidence is "squarely refused by a solid line of First Circuit cases"),

*cert. denied,* 502 U.S. 876, 112 S.Ct. 217, 116 L.Ed.2d 175 (1991); *United States v. Maceo,* 873 F.2d 1, 3 (1st Cir.) (validity of indictment not affected by alleged insufficiency of evidence because grand jury proceeding is preliminary phase of criminal justice process and because of constitutional protections afforded defendant at jury trial), *cert. denied,* 493 U.S. 840, 110 S.Ct. 125, 107 L.Ed.2d 86 (1989); and *United States v. Rivera–Santiago,* 872 F.2d 1073 (1st Cir.) (summarizing legal principles governing dismissal of grand jury indictments and finding it well established that "[a]n indictment returned by a legally constituted and unbiased grand jury, ... if valid on its face, is enough to call for trial of the charge on the merits"), *cert. denied,* 492 U.S. 910, 109 S.Ct. 3227, 106 L.Ed.2d 576 (1989).

In the present matter, the evidence before the grand jury was more than sufficient to establish probable cause. Testimony before the grand jury established: that three unidentified individuals left a vehicle which may have been involved in a drive-by shooting in Springfield and entered 360 Jarvis Avenue in Holyoke; that a resident saw three individuals run into the building carrying guns and heard them enter the apartment directly above hers; that Torres was found hiding behind a dresser in that apartment; that a search of the apartment revealed, *inter alia,* a rifle and two sawed-off shotguns under the dresser; that the two shotguns had barrel lengths of less than 18 inches; and that Torres was a previously convicted felon. This was indeed enough to allow the grand jury to find probable cause to charge Torres with both counts in the indictment. Accordingly, Torres' motion to dismiss should be denied.

**3.** The parties are advised that under the provisions of Rule 3(b) of the Rules for United States Magistrates in the United States District Court for the District of Massachusetts, any party who objects to these findings and recommendations must file a written objection with the Clerk of this Court **within ten (10) days** of the party's receipt of this Report and Recommendation. The written objection must specifically identify the portion of the proposed findings or recommendations to which objection is made and the basis for such objection. The parties are further advised that failure to comply with this rule shall preclude further appellate review by the Court of Appeals of the District Court order entered pur-

## V. CONCLUSION

For the reasons set forth above, the Court recommends that Defendant Rodriguez's Motion to Suppress (Docket No. 80) be DENIED with respect to the physical evidence seized during the searches, DENIED with respect to the statements he made on February 21, 1995 and ALLOWED with respect to statements he made on May 26, 1995. The Court also recommends that Defendant Torres' motion to suppress physical evidence seized during the searches (Docket No. 83) be DENIED, that his motion to dismiss (Docket No. 89) be DENIED and that his motion to suppress his statement of February 21, 1995 (Docket No. 88) be ALLOWED.[3]

DATED: January 16, 1996

suant to this Report and Recommendation. See *Keating v. Secretary of Health & Human Services,* 848 F.2d 271, 275 (1st Cir.1988); *United States v. Valencia–Copete,* 792 F.2d 4, 6 (1st Cir.1986); *Park Motor Mart v. Ford Motor Co.,* 616 F.2d 603, 604 (1st Cir.1980); *United States v. Vega,* 678 F.2d 376, 378–379 (1st Cir.1982); and *Scott v. Schweiker,* 702 F.2d 13, 14 (1st Cir.1983). See also *Thomas v. Arn,* 474 U.S. 140, 154–55, 106 S.Ct. 466, 474, 88 L.Ed.2d 435 (1985), *reh'g denied,* 474 U.S. 1111, 106 S.Ct. 899, 88 L.Ed.2d 933 (1986). A party may respond to another party's objections within ten (10) days after being served with a copy thereof.